UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FILED
JUL 17 2024
U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **4:24CR374 JAR/SRW** |
| ) | |
| ) | |
| KENNETH C. SPARKS III, ) | |
| JEFFREY C. OBOITE, ) | |
| HAROLD G. LONG, ) | |
| MYA M. MCCLAIN, and ) | |
| JAVONTE D. LONG, ) | |
| ) | |
| Defendants. ) | |

## INDICTMENT

The Grand Jury charges that, at all times relevant to the Indictment:

## INTRODUCTION

1. During the scheme to defraud outlined below, Defendant Kenneth C. Sparks III ("Defendant Sparks") and his co-conspirators, including Defendant Jeffrey C. Oboite ("Defendant Oboite"), Defendant Harold G. Long ("Defendant H. Long"), Defendant Mya M. McClain ("Defendant McClain"), and Defendant Javonte D. Long ("Defendant J. Long"), used Faith Walk Ministry and other entities to fraudulently obtain over $1 million in taxpayer money that was reserved for struggling small businesses during the pandemic. Instead of using the fraudulently obtained taxpayer dollars for permissible purposes, Defendant Sparks used the funds that he took to compensate his co-conspirators and to purchase designer clothing, luxury merchandise, and expensive cars for himself.

1

2. Defendant Sparks worked as a visiting minister at Faith Walk Ministry—a church in Paris, Missouri. Defendant Sparks was convicted of a felony offense on or about May 23, 2014, and was placed on parole for that felony offense on or about July 26, 2017. Defendant Sparks was indicted for another felony offense on or about October 30, 2019.

3. Defendant Oboite resided in the District of Maryland, and he operated businesses called Angel's Management Group, LLC, Emerald Score LLC, and O&S Construction LLC. Through those businesses, Defendant Oboite participated in a scheme to fraudulently obtain pandemic assistance loans.

4. Defendant H. Long resided within the Eastern District of Missouri, and he worked as the lead minister and chief executive officer at Faith Walk Ministry.

5. Defendant McClain resided within the Eastern District of Missouri, and she worked as an administrative assistant at Faith Walk Ministry.

6. Defendant J. Long resided within the Eastern District of Missouri, and he was a member at Faith Walk Ministry.

7. The United States Small Business Administration ("SBA") is an executive-branch agency of the United States government that provides support to entrepreneurs and small businesses. The mission of the SBA is to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in economic recovery after disasters.

## The Paycheck Protection Program

8. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, 134 Stat. 281 (2020), was a federal law that was enacted in or around March 2020 to provide emergency financial assistance to the millions of Americans suffering the economic

impact caused by the COVID-19 pandemic. One source of relief provided for in the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through the Paycheck Protection Program ("PPP"). The purpose of loans issued under the PPP was to enable small businesses suffering from the economic downturn to continue to pay salary or wages to their employees.

9. The types of small businesses eligible for a PPP loan included individuals who operated as a sole proprietorship and did not have any employees. Such individuals were eligible to receive a maximum PPP loan of up to $20,833 to cover their lost compensation or income from the sole proprietorship. To obtain a PPP loan, a qualifying individual was required to submit and sign a PPP loan application. The PPP loan application required the applicant to acknowledge the program rules and make certain affirmative certifications to obtain the PPP loan. In the PPP loan application, the applicant was required to certify, among other things, (a) that the small business was in operation on February 15, 2020; and (b) the annual income and expenditures for the sole proprietorship, as reported to the Internal Revenue Service on Form 1040, Schedule C, for a given tax year. These certifications were used to calculate the amount of money the sole proprietorship was eligible to receive under the PPP. In addition, the individual applying for a PPP loan was required to submit valid documentation supporting the sole proprietorship's annual income.

10. For businesses that were not sole proprietorships, a qualifying business was required to submit a PPP loan application, signed by an authorized representative of the business. In the PPP loan application for those businesses, the small business (through its authorized representative) was required to certify: (a) that the small business was in operation on February 15, 2020; (b) the average monthly payroll expenses; and (c) the number of employees. These certifications were used to calculate the amount of money that the small business was eligible to

3

receive under the PPP.

11. For all of the PPP loan applications submitted as part of the scheme outlined below, the application asked whether "the Applicant (if an individual) or any owner of the Applicant [is] presently incarcerated or, for any felony, presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction?" Applicants were required to certify a "yes" or "no" response to that question.

12. PPP loan applications were processed by participating lenders. If a PPP loan application was approved, the participating lender funded the loan using its own monies, which were then guaranteed by the SBA. Generally, in the event that the borrower defaulted on a PPP loan, the SBA would purchase the borrower's debt from the lending financial institution and take on the responsibility for paying back the loan.

13. PPP loan funds were required to be used on certain permissible expenses, including payroll costs, mortgage interest, rent, and utilities for the business. In the PPP loan application, the borrower must certify that "[a]ll loan proceeds will be used only for business-related purposes . . . as specified in the loan application and consistent with the Paycheck Protection Program Rules." In that same application, the borrower must also certify that "[t]he funds will be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures as specified under the Paycheck Protection Program Rules."

14. The lenders that received the PPP loan applications as a result of the fraudulent scheme outlined below were third-party participating lenders in the Paycheck Protection Program.

## COVID-19 EIDL Loans

15. The COVID-19 Economic Injury Disaster Loan ("EIDL") program was administered by the SBA. Unlike PPP loans, which were issued by participating lenders, COVID-19 EIDL loans were issued directly by the SBA and were not eligible for forgiveness.

16. To obtain a COVID-19 EIDL loan, an applicant had to submit an EIDL loan application electronically. All EIDL loan applications were submitted online. Prior to July 11, 2020, applications were submitted through three different servers located in either Boydton, Virginia, West Des Moines, Iowa, or Quincy, Washington. Beginning on July 11, 2020, applications were handled by an SBA contractor with servers located in Des Moines, Iowa.

17. In the EIDL loan application, the applicant was required to, among other things, provide their personal information, as well as their business information, including, but not limited to, their business's number of employees as of January 31, 2020, their business's gross revenues for the 12 months prior to January 31, 2020, and their business's cost of goods sold for the 12 months prior to January 31, 2020. The applicant was also required to certify, under penalty of perjury, that all information contained in, and submitted with, the application was "true and correct."

18. As part of the EIDL loan application, the applicant was also required to certify that "[n]o principal of the Applicant with a 50 percent or greater ownership interest is more than sixty (60) days delinquent on child support obligations." In addition, the application also required the applicant to answer whether the applicant was "presently subject to an indictment[?]" Furthermore, the application also required the applicant to answer whether, "[w]ithin the last five years, for any felony, have you ever been . . . placed on any form of parole[?]"

5

19.     Prior to April 2021, an applicant was eligible to receive a COVID-19 EIDL loan up to an amount equal to 50% of the applicant's gross profit (*i.e.*, gross revenues minus cost of goods sold) for the 12 months prior to January 31, 2020.

20.     If an EIDL loan application or advance request was approved, the SBA's Denver Finance Center located in Denver, Colorado created payment files and authorized payments of EIDL funds. The disbursement of EIDL funds was transmitted by the FMS to the Treasury and then to the recipient's bank account.

21.     EIDL funds were permitted to be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

## COUNT ONE
### (Wire Fraud Conspiracy: 18 U.S.C. § 1349)

22.     Each of the above allegations is hereby incorporated by reference as if fully set forth herein.

23.     Beginning in or about September 17, 2018, and continuing through at least in or about July 17, 2024, in the Eastern District of Missouri and elsewhere, the defendants,

**KENNETH C. SPARKS III,
JEFFREY C. OBOITE,
HAROLD G. LONG,
MYA M. MCCLAIN, and
JAVONTE D. LONG**

voluntarily and intentionally combined, conspired, confederated, and agreed with each other and others known and unknown to the Grand Jury, to commit the following offense against the United States:

(a)     Having devised and intended to devise a scheme and artifice to defraud and obtain money and property by means of materially false and fraudulent pretenses and representations and for the purpose of executing such scheme, and attempting to do

6

so, did knowingly cause and attempt to cause to be transmitted by means of wire communication in interstate commerce, writings, signs, and signals in the form of interstate electronic communications, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1349.

### Manner and Means of the Scheme and the Conspiracy

24. The primary purpose of the conspiracy was to execute a wire fraud scheme and artifice to defraud and obtain money, specifically, pandemic assistance dollars from lenders, by means of materially false and fraudulent pretenses, representations, and promises.

25. The conspiracy to execute a wire fraud scheme and artifice to defraud and obtain money and property by means of materially false and fraudulent pretenses, representations, and promises was carried out by Defendants in the following manner:

**I. Defendant Sparks and Defendant Oboite Unlawfully Obtained At Least $200,000 in Pandemic Assistance Money Through Fraudulent Loan Applications Submitted in Their Own Names.**

26. As part of the conspiracy, Defendant Sparks and Defendant Oboite both submitted or caused to be submitted fraudulent loan applications for pandemic assistance dollars in their own names. Defendant Oboite taught Defendant Sparks and Defendant McClain how to submit fraudulent PPP loan applications and he coached them through the process of obtaining fraudulent PPP loans based on his experience obtaining fraudulent PPP loans for himself.

27. Specifically, in furtherance of the scheme to defraud, on or about August 5, 2020, Defendant Oboite submitted a fraudulent sole proprietor PPP loan application to Cross River Bank, a participating PPP lender. In his fraudulent PPP loan application, Defendant Oboite inflated his average monthly payroll that he purportedly made as a "consultant" to receive the maximum

amount in his PPP loan. Among other material misrepresentations, Defendant Oboite also falsely and fraudulently represented in that same PPP loan application that he was not "an owner of any other business." In truth and fact, as Defendant Oboite knew full well, Defendant Oboite was the 100% owner of Angels Management Group, which had already received a previous PPP loan. In support of his fraudulent PPP loan application, Defendant Oboite also submitted a false and fraudulent Schedule C, which included gross receipts that he did not earn as a consultant sole proprietor. Based on Defendant Oboite's material misrepresentations, Cross River Bank wired approximately $20,833.32 into Defendant Oboite's bank account.

28.     Furthermore, on or about February 23, 2021, Defendant Oboite submitted another fraudulent sole proprietor PPP loan application to Cross River Bank. Like his previous fraudulent PPP loan application, Defendant Oboite once again inflated his average monthly payroll that he purportedly made as a "consultant" to receive the maximum amount in this PPP loan. In addition, Defendant Oboite also falsely and fraudulently represented that he was not "an owner of any other business." Further, in support of his fraudulent PPP loan application, Defendant Oboite submitted a false and fraudulent Schedule C, which included gross receipts that he did not earn as a consultant sole proprietor. Based on Defendant Oboite's material misrepresentations, Cross River Bank wired an additional $20,833.32 into Defendant Oboite's bank account.

29.     After obtaining his own fraudulent PPP loans, Defendant Oboite coached Defendant McClain and Defendant Sparks on how to obtain fraudulent PPP loans under Defendant Sparks' name. For his work, Defendant Oboite expected a cut of the proceeds that Defendant Sparks received as a result of Defendant Sparks' fraudulent PPP loan applications. To obtain the proceeds of his fraudulent PPP loans, Defendant Sparks had Defendant McClain create and submit Defendant Sparks' fraudulent PPP loan applications in furtherance of the scheme to defraud.

8

30.     Specifically, on or about April 2, 2021, in the Eastern District of Missouri—and with the assistance of Defendant Oboite and Defendant McClain—Defendant Sparks submitted or caused to be submitted a fraudulent sole proprietor PPP loan application. In that fraudulent PPP loan application, Defendant Sparks falsely and fraudulently represented that he made $98,700 in gross annual income from a sole proprietorship consulting business that he purportedly owned. In truth and fact, however, Defendant Sparks did not own a sole proprietorship consulting business. Also, in that same fraudulent PPP loan application, Defendant Sparks falsely and fraudulently stated that he was not subject to a felony indictment. In truth and fact, as Defendant Sparks knew full well, he had been subject to an indictment for a felony offense since on or about October 30, 2019. In addition, in support of his fraudulent PPP loan application, Defendant Sparks submitted or caused to be submitted a false and fraudulent Schedule C—which was never filed with the IRS—and which included gross receipts that he did not earn from a sole proprietorship consulting business. To verify his identity as a PPP loan applicant, Defendant Sparks was required to upload selfies during the PPP loan processing period. As required, Defendant Sparks took and uploaded the following selfies, which he took at Faith Walk Ministry, in the Eastern District of Missouri.



Based on Defendant Sparks' material misrepresentations, the participating PPP lender (Fountainhead SBF LLC) wired $20,562.00 into Defendant Sparks' bank account on or about April 21, 2021.

9

31. On or about April 22, 2021, in the Eastern District of Missouri—and with the assistance of Defendant Oboite and Defendant McClain—Defendant Sparks submitted or caused to be submitted another fraudulent sole proprietor PPP loan application. In that fraudulent PPP loan application, Defendant Sparks once again falsely and fraudulently represented that he made $98,700 in annual gross income from a sole proprietorship consulting business that he purportedly owned. In truth and fact, however, Defendant Sparks did not own a sole proprietorship consulting business. Also, in that same fraudulent PPP loan application, Defendant Sparks falsely and fraudulently stated that he was not subject to a felony indictment. In truth and fact, as Defendant Sparks knew full well, he had been subject to an indictment for a felony offense since on or about October 30, 2019. In addition, as a supporting document to his fraudulent PPP loan application, Defendant Sparks submitted or caused to be submitted a false and fraudulent Schedule C—which was never filed with the IRS—and which included gross receipts that he did not earn from a consulting sole proprietorship business. Based on Defendant Sparks' material misrepresentations, the participating PPP lender (Benworth Capital Partners, LLC) wired $20,562.00 into Defendant Sparks' bank account on or about May 26, 2021.

32. Also in furtherance of the scheme to defraud, on or about June 16, 2020, in the Eastern District of Missouri—and with the assistance of Defendant McClain—Defendant Sparks submitted or caused to be submitted a fraudulent EIDL application to the SBA for an entity called The Miracle Place International. In his fraudulent EIDL application for The Miracle Place International Church, Defendant Sparks vastly inflated the entity's gross annual revenue. In that same fraudulent EIDL application, Defendant Sparks falsely and fraudulently represented that he was not "presently subject to an indictment[.]" In truth and fact, as Defendant Sparks well knew, he was subject to a felony indictment that was returned on or about October 30, 2019. Among

10

other material misrepresentations in the EIDL application, Defendant Sparks also falsely and fraudulently represented that he had not been "placed on any form of parole" within the last five years for a felony offense. In truth and fact, as Defendant Sparks well knew, he was placed on parole for a separate felony offense on or about July 26, 2017. Based on Defendant Sparks' material misrepresentations, the SBA wired $147,900 into Defendant Sparks' bank account on or about July 6, 2020. Instead of using the EIDL money for legitimate business expenses, Defendant Sparks used the proceeds of his fraud to make payments to Gold Coast Bentley (a luxury car dealership in Chicago, Illinois) and to purchase designer shoes, among other impermissible expenses.

33. All told, between 2020 and 2021, Defendant Sparks and Defendant Oboite received at least $200,000 in pandemic assistance money by submitting—or causing to be submitted—fraudulent loan applications in their own names.

**II. Defendants Unlawfully Obtained Over One Million Dollars in PPP Loan Proceeds Through Fraudulent Loan Applications Submitted in the Names of Faith Walk Ministry Members.**

34. To execute the scheme to defraud, Defendant Sparks obtained—and then subsequently abused—his position of authority as a minister at Faith Walk Ministry. In that position of authority, Defendant Sparks worked to secure the trust of Faith Walk Ministry church members so that he could have fraudulent PPP loans taken out in their names and enrich himself with the proceeds. In an attempt to conceal his fraud scheme from parishioners, Defendant Sparks often told them that he was an "Apostle" of God, whose decisions and decrees could not be questioned. Defendant Sparks also had Defendant H. Long assure Faith Walk Ministry parishioners that Defendant Sparks could be trusted with their personal and financial information.

11

35. To have fraudulent PPP loans taken out in the names of his church members, Defendant Sparks and his co-conspirators obtained church members' personal and financial information through various lies and falsehoods. For instance, Defendant Sparks often told church members that they needed to provide their information so that his co-conspirators could fix their credit scores. On other occasions, Defendant Sparks told church members that his co-conspirators needed their information to secure funding for Faith Walk Ministry. Despite these representations, Defendant Sparks and his co-conspirators used Faith Walk Ministry church members' personal and financial information to take out fraudulent PPP loans in their names for the personal enrichment of Defendant Sparks and Defendant Oboite.

36. As another step in the scheme to defraud, Defendant Sparks directed Defendant McClain to create email addresses in the names of Faith Walk Ministry church members. As directed, Defendant McClain created email addresses in the names of church members so that those email addresses could be used to apply for the fraudulent loans without alerting church members to the full scope of the fraud. As another step in the fraud scheme, Defendant Sparks encouraged Faith Walk Ministry parishioners to open new bank accounts at Navy Federal Credit Union, where the fraudulent PPP loan proceeds were later deposited at his and Defendant Oboite's direction. Additionally, Defendant Sparks commissioned the creation of false and fraudulent tax documents in the names of Faith Walk Ministry church members. Those fraudulent tax documents, which were later submitted to the lenders in support of the fraudulent PPP loans, included fictitious earnings for the church members that were never reported to the IRS.

37. To execute the fraudulent scheme, Defendant Sparks and Defendant Oboite directed Defendant McClain to submit the fraudulent sole proprietorship PPP loans in the names of Faith Walk Ministry church members. Defendant Oboite specifically coached Defendant

McClain on how to fill out these fraudulent PPP loan applications. As directed by Defendant Sparks, Defendant McClain either submitted or substantially assisted in the submission of fraudulent sole proprietorship PPP loan applications in the names of Faith Walk Ministry church members. Each of those fraudulent PPP loan applications listed businesses that did not exist or included revenues that were never earned. The vast majority of the fraudulent PPP loans completed by Defendant McClain—including the fraudulent PPP loan that she submitted in her own name—were submitted via interstate wiring from Faith Walk Ministry, within the Eastern District of Missouri.

38. In furtherance of the scheme to defraud, Defendant J. Long—a church member at Faith Walk Ministry—caused the submission of a fraudulent sole proprietorship PPP loan in his own name on or about April 2, 2021. Like many of the fraudulent Faith Walk Ministry PPP loan applications, Defendant J. Long's application was for a "consultant" business that did not exist. Defendant J. Long personally participated in the application process by signing the promissory note from his personal residence, within the Eastern District of Missouri. In addition, Defendant J. Long pocketed at least $8,000 of the PPP loan proceeds for himself.

39. In addition to taking out fraudulent sole proprietorship PPP loans in the names of Faith Walk Ministry church members, Defendant Sparks and Defendant Oboite also directed Defendant McClain and Defendant H. Long to submit fraudulent PPP loan applications for businesses purportedly owned by Defendant H. Long. For example, on or about April 4, 2021, Defendant McClain—with the assistance of Defendant H. Long—submitted a fraudulent PPP loan application for a company called "Jabin II." Included in the fraudulent PPP loan application for Jabin II was the material misrepresentation that the company paid an average monthly payroll of $64,657.00. In truth and fact, as Defendant McClain and Defendant H. Long well knew, Jabin II

13

had little to no payroll expenses. In support of the fraudulent PPP loan application that Defendant McClain submitted for Jabin II, Defendant McClain also submitted false and fraudulent tax forms, which were approved and signed by Defendant H. Long. Included in Defendant H. Long's false and fraudulent tax documents for Jabin II was the misrepresentation that Jabin II earned $1,989,000.00 in gross receipts or sales during 2019. In truth and fact, as Defendant H. Long and Defendant McClain well knew, this figure was vastly inflated. Despite Defendant H. Long's knowledge that the Jabin II tax documents were false and fraudulent, he approved and signed those documents to ensure that the lender provided Jabin II with a substantial PPP loan. Based on the material misrepresentations made by Defendant H. Long and Defendant McClain as part of the Jabin II PPP loan application, the participating PPP lender (TAB Bank) wired a total of $161,642.00 into a bank account controlled by Defendant H. Long.

40. Based on the material misrepresentations included in the dozens of fraudulent PPP loan applications that were completed and submitted at the direction of Defendant Sparks and Defendant Oboite, participating PPP lenders paid out more than one million dollars in government-backed funds. Defendant Oboite—for his role in the conspiracy—expected to receive a percentage of the fraudulent PPP loan proceeds.

41. After Faith Walk Ministry church members received the fraudulent PPP loan proceeds in their newly-created Navy Federal Credit Union bank accounts, Navy Federal Credit Union froze several of the church members' bank accounts based on suspected fraud. In an effort to conceal the scheme to defraud and reopen the church members' bank accounts, Defendant Sparks and Defendant Oboite coached the church members on the lies that they should tell Navy Federal Credit Union. For example, on or about June 14, 2021, Defendant Oboite emailed Defendant Sparks and Defendant McClain a "script" for Defendant J. Long to use when he spoke

14

with a representative of Navy Federal Credit Union. Defendant Oboite's false and fraudulent script for Defendant J. Long included the following information:

> Javonte Long
>
> Question 1: What is the purpose of you taking out the loan? Why did you get the loan?
>
> Your Answer:
> I am a sole proprietor and I applied for the sole proprietor PPP loan
> a) I am the one who applied using my computer.
> b) Nobody stole my identity to apply
> c) I used my social security number and I have been a sole proprietor for the last few years
> d) I was reviewed by the SBA approved lender called HARVEST SMALL BUSINESS and they and the SBA approved my application for the sole proprietor
> e) So seems to be the problem?
>
> Question 2: If they ask how long you've been a sole proprietor?
>
> Answer: about 3 years

42. After Faith Walk Ministry church members received the unfrozen fraudulent PPP loan proceeds in their bank accounts, Defendant Sparks and others directed them on where to send the proceeds. Unbeknownst to many Faith Walk Ministry church members, Defendant Sparks ultimately received hundreds of thousands of dollars from the fraudulent PPP loans that were submitted in their names. Instead of providing that money to Faith Walk Ministry or his parishioners, Defendant Sparks spent the fraudulently obtained loan proceeds on himself—paying for designer clothing, luxury merchandise, and expensive cars.

43. When Faith Walk Ministry church members questioned Defendant H. Long about the loans proceeds in their bank accounts or where the money was going, Defendant H. Long assured those parishioners that they should trust Defendant Sparks. When those same questions were posed by church members to Defendant Sparks, he would threaten church members with "curses from God." Defendant Sparks also regularly scolded church members who inquired about his fraudulent scheme for questioning a "man of God."

15

## COUNTS TWO – NINE
### (Wire Fraud: 18 U.S.C. § 1343)

44. Each of the above allegations is hereby incorporated by reference as if fully set forth herein.

45. Beginning by at least on or about September 17, 2018, and continuing through at least on or about July 17, 2024, in the Eastern District of Missouri, the defendants listed below, with the intent to defraud, devised and intended to devise a scheme and artifice to defraud lenders and to obtain money and property from lenders by means of material false and fraudulent pretenses, representations, and promises, as described further herein.

46. On or about the dates set forth below, in the Eastern District of Missouri, and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and obtain money and property by means of false and fraudulent pretenses, representations and promises and for the purpose of executing the same, the defendants specified below did knowingly transmit and cause to be transmitted by means of wire communication in and affecting interstate commerce, certain writings, signs, signals, pictures, or sounds, to wit:

|   |   |   |   |
|---|---|---|---|
| 2 | **Defendant Sparks** | 6/16/2020 | An electronic EIDL application submitted for The Miracle Place International through an out-of-state server from the Eastern District of Missouri. |
| 3 | **Defendant Sparks** **Defendant Oboite** **Defendant McClain** **Defendant H. Long** | 4/1/2021 | An electronic PPP loan application submitted for Defendant H. Long through an out-of-state server from the Eastern District of Missouri. |
| 4 | **Defendant Sparks** **Defendant Oboite** **Defendant McClain** **Defendant J. Long** | 4/2/2021 | An electronic PPP loan application submitted for Defendant J. Long through an out-of-state server from the Eastern District of Missouri. |
| 5 | **Defendant Sparks** **Defendant Oboite** **Defendant McClain** | 4/2/2021 | An electronic PPP loan application submitted for Defendant Sparks through an out-of-state server from the Eastern District of Missouri. |

| 6 | Defendant Sparks<br>Defendant Oboite<br>Defendant McClain | 4/2/2021 | An electronic PPP loan application submitted for Parishioner J.F. through an out-of-state server from the Eastern District of Missouri. |
| --- | --- | --- | --- |
| 7 | Defendant Sparks<br>Defendant Oboite<br>Defendant McClain | 4/3/2021 | An electronic PPP loan application submitted by Defendant McClain in her own name, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 8 | Defendant Sparks<br>Defendant Oboite<br>Defendant McClain<br>Defendant H. Long | 4/4/2021 | An electronic PPP loan application for Jabin II Inc., which traveled through an out-of-state server from the Eastern District of Missouri. |
| 9 | Defendant Sparks<br>Defendant Oboite<br>Defendant McClain | 4/10/2021 | An electronic PPP loan application submitted for Parishioner R.L. through an out-of-state server from the Eastern District of Missouri. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS TEN – ELEVEN
### (Aggravated Identity Theft: 18 U.S.C. § 1028A)

47.     Each of the above allegations is hereby incorporated by reference as if fully set forth herein.

48.     On or about the dates listed below, within the Eastern District of Missouri, the defendant,

**KENNETH C. SPARKS III**,

did knowingly use, without lawful authority, a means of identification of another person during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to wit, wire fraud, in violation of 18 U.S.C. § 1343, knowing that the means of identification belonged to another actual person, as described below, in that Defendant Sparks used or caused to be used the means of identification listed below in order to submit or cause to be submitted fraudulent loan applications.

| 10 | 4/2/2021 | The name of Parishioner J.F. included in a PPP loan application. |
| --- | --- | --- |
| 11 | 4/10/2021 | The name of Parishioner R.L. included in a PPP loan application. |

All in violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.

## FORFEITURE ALLEGATION

The Grand Jury further alleges there is probable cause that:

1. Pursuant to Title 18, United States Code, Sections 982(a)(2), upon conviction of an offense in violation of Title 18, United States Code, Sections 1343 and 1349, as set forth in Counts One through Nine, the defendant shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of such violation. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to such violation.

2. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL.

_____
FOREPERSON

SAYLER A. FLEMING
United States Attorney

_____
DEREK J. WISEMAN, #67257MO
Assistant United States Attorney