UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

**FILED**

SEP 1 1 2024

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S1 4:24-cr-00374-JAR-SRW |
| | ) | |
| | ) | |
| KENNETH C. SPARKS III, | ) | |
| JEFFREY C. OBOITE, | ) | |
| HAROLD G. LONG, | ) | |
| MYA M. MCCLAIN, | ) | |
| JAVONTE D. LONG, | ) | |
| TERRANCE A. KWADE, | ) | |
| AUGUSTINE HARDIN, | ) | |
| NAKEESHA D. LONG, | ) | |
| KIMBERLY SHEFTE, | ) | |
| ROSALYN C. WEST, and | ) | |
| MICHAEL S. MCCLAIN, | ) | |
| | ) | |
| Defendants. | ) | |

**SUPERSEDING INDICTMENT**

The Grand Jury charges that, at all times relevant to the Indictment:

**INTRODUCTION**

1.      During the conspiracy outlined below, Defendant Kenneth C. Sparks III
("Defendant Sparks") and his co-conspirators, including Defendant Jeffrey C. Oboite ("Defendant
Oboite") and Defendant Harold G. Long ("Defendant H. Long") used Faith Walk Ministry and
other entities to fraudulently obtain over $1 million in taxpayer money that was reserved for
struggling small businesses during the pandemic. Instead of using the fraudulently obtained
taxpayer dollars for permissible purposes, Defendant Sparks used the funds that he took to
compensate his co-conspirators and to purchase designer clothing, luxury merchandise, and
expensive cars for himself.

2.    In addition to fraudulently obtaining pandemic assistance dollars, Defendant Sparks and Defendant Terrance A. Kwade ("Defendant Kwade") also executed a scheme to defraud lending institutions out of hundreds of thousands of dollars by taking out fraudulent automobile and personal loans in the names of Defendant Sparks' parishioners and associates.

**Defendants and Entities**

3.    Defendant Sparks worked as a visiting minister at Faith Walk Ministry—a church in Paris, Missouri. Defendant Sparks was convicted of a felony offense on or about May 23, 2014, and was placed on parole for that felony offense on or about July 26, 2017. Defendant Sparks was indicted for another felony offense on or about October 30, 2019.

4.    Defendant Oboite resided in the District of Maryland, and he operated businesses called Angel's Management Group, LLC, Emerald Score LLC, and O&S Construction LLC. Through those businesses, Defendant Oboite participated in a scheme to obtain fraudulent pandemic assistance loans.

5.    Defendant H. Long resided within the Eastern District of Missouri, and he worked as the lead minister and chief executive officer at Faith Walk Ministry.

6.    Defendant Mya M. McClain ("Defendant McClain") resided within the Eastern District of Missouri, and she worked as an administrative assistant at Faith Walk Ministry.

7.    Defendant Javonte D. Long ("Defendant J. Long") resided within the Eastern District of Missouri, and he was a parishioner at Faith Walk Ministry.

8.    Defendant Kwade resided in the Northern District of Georgia, and he operated a business called Kwade Legacy Enterprises, LLC. Through that business, Defendant Kwade worked with Defendant Sparks to execute a scheme to defraud lending institutions by taking out fraudulent loans in the names of Defendant Sparks' parishioners and associates.

2

9.    Defendant Augustine Hardin ("Defendant A. Hardin) resided within the Eastern District of Missouri, and she worked as an administrative assistant at Faith Walk Ministry.

10.    Defendant Kimberly Shefte ("Defendant Shefte") resided within the Eastern District of Missouri, and she was a parishioner at Faith Walk Ministry.

11.    Defendant Rosalyn C. West ("Defendant West") resided within the Eastern District of Missouri, and she was a parishioner at Faith Walk Ministry.

12.    Defendant Nakeesha D. Long ("Defendant N. Long") resided within the Eastern District of Missouri, and she was a parishioner at Faith Walk Ministry.

13.    Defendant Michael S. McClain ("Defendant M.S. McClain") resided within the Eastern District of Missouri, and he was a parishioner at Faith Walk Ministry.

14.    The United States Small Business Administration ("SBA") is an executive-branch agency of the United States government that provides support to entrepreneurs and small businesses. The mission of the SBA is to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in economic recovery after disasters.

### The Paycheck Protection Program

15.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, 134 Stat. 281 (2020), was a federal law that was enacted in or around March 2020 to provide emergency financial assistance to the millions of Americans suffering the economic impact caused by the COVID-19 pandemic. One source of relief provided for in the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through the Paycheck Protection Program ("PPP"). The purpose of loans issued under the PPP was to enable small businesses suffering from the economic downturn to continue to pay

3

salary or wages to their employees.

16.    The types of small businesses eligible for a PPP loan included individuals who operated as a sole proprietorship and did not have any employees.  Such individuals were eligible to receive a maximum PPP loan of up to $20,833 to cover their lost compensation or income from the sole proprietorship.  To obtain a PPP loan, a qualifying individual was required to submit and sign a PPP loan application. The PPP loan application required the applicant to make certain affirmative certifications to the lender in order to obtain the PPP loan.  In the PPP loan application, the applicant was required to certify, among other things, (a) that the small business was in operation on February 15, 2020; and (b) the annual income and expenditures for the sole proprietorship, as reported to the Internal Revenue Service on Form 1040, Schedule C, for a given tax year. These certifications were used to calculate the amount of money the sole proprietorship was eligible to receive under the PPP.  In addition, the individual applying for a PPP loan was required to submit valid documentation supporting the sole proprietorship's annual income.

17.    For businesses that were not sole proprietorships, a qualifying business was required to submit a PPP loan application, signed by an authorized representative of the business. In the PPP loan application for those businesses, the small business (through its authorized representative) was required to certify: (a) that the small business was in operation on February 15, 2020; (b) the average monthly payroll expenses; and (c) the number of employees. These certifications were used to calculate the amount of money that the small business was eligible to receive under the PPP.

18.    For all of the PPP loan applications submitted as part of the scheme outlined below, the application asked whether "the Applicant (if an individual) or any owner of the Applicant [is] presently incarcerated or, for any felony, presently subject to an indictment, criminal information,

4

arraignment, or other means by which formal criminal charges are brought in any jurisdiction?" Applicants were required to certify a "yes" or "no" response to that question. The loan application further advised applicants that a "yes" response to that question would result in denial of the loan application.

19.     PPP loan applications were processed by participating lenders. If a PPP loan application was approved, the participating lender funded the loan using its own monies, which were then guaranteed by the SBA. After the lender funded the PPP loan to the borrower, the lender submitted loan disbursement details to the SBA's server located in Sterling, VA. In the event that the borrower defaulted on a PPP loan, the SBA would purchase the borrower's debt from the lending financial institution and take on the responsibility for paying back the loan.

20.     PPP loan funds were required to be used on certain permissible expenses, including payroll costs, mortgage interest, rent, and utilities for the business. In the PPP loan application, the borrower must certify that "[a]ll loan proceeds will be used only for business-related purposes . . . as specified in the loan application[.]" In that same application, the borrower must also certify that "[t]he funds will be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures as specified under the Paycheck Protection Program Rules."

21.     The lenders that received the PPP loan applications as a result of the fraudulent scheme outlined below were third-party participating lenders in the Paycheck Protection Program.

5

## COVID-19 EIDL Loans

22.     The COVID-19 Economic Injury Disaster Loan ("EIDL") program was administered by the SBA. Unlike PPP loans, which were issued by participating lenders, COVID-19 EIDL loans were issued directly by the SBA and were not eligible for forgiveness.

23.     To obtain a COVID-19 EIDL loan, an applicant had to submit an EIDL loan application electronically. All EIDL loan applications were submitted online. Prior to July 11, 2020, applications were submitted through three different servers located in either Boydton, Virginia, West Des Moines, Iowa, or Quincy, Washington. Beginning on July 11, 2020, applications were handled by an SBA contractor with servers located in Des Moines, Iowa.

24.     In the EIDL loan application, the applicant was required to, among other things, provide their personal information, as well as their business information, including, but not limited to, their business's number of employees as of January 31, 2020, their business's gross revenues for the 12 months prior to January 31, 2020, and their business's cost of goods sold for the 12 months prior to January 31, 2020. The applicant was also required to certify, under penalty of perjury, that all information contained in, and submitted with, the application was "true and correct."

25.     As part of the EIDL loan application, the applicant was also required to certify that "[n]o principal of the Applicant with a 50 percent or greater ownership interest is more than sixty (60) days delinquent on child support obligations." In addition, the application also required the applicant to answer whether the applicant was "presently subject to an indictment[?]" Furthermore, the application also required the applicant to answer whether, "[w]ithin the last five years, for any felony, have you ever been . . . placed on any form of parole[?]"

6

26.     Prior to April 2021, an applicant was eligible to receive a COVID-19 EIDL loan up to an amount equal to 50% of the applicant's gross profit (*i.e.*, gross revenues minus cost of goods sold) for the 12 months prior to January 31, 2020.

27.     If an EIDL loan application or advance request was approved, the SBA's Denver Finance Center located in Denver, Colorado created payment files and authorized payments of EIDL funds. The disbursement of EIDL funds was transmitted by the FMS to the Treasury and then to the recipient's bank account.

28.     EIDL funds were permitted to be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

## COUNT ONE
### (Wire Fraud Conspiracy: 18 U.S.C. § 1349)

29.     Each of the above allegations is hereby incorporated by reference as if fully set forth herein.

30.     Beginning in or about September 17, 2018, and continuing through at least in or about July 17, 2024, in the Eastern District of Missouri and elsewhere, the defendants,

**KENNETH C. SPARKS III,**
**JEFFREY C. OBOITE,**
**HAROLD G. LONG,**
**MYA M. MCCLAIN,**
**JAVONTE D. LONG**
**AUGUSTINE HARDIN,**
**NAKEESHA D. LONG,**
**KIMBERLY SHEFTE, and**
**ROSALYN C. WEST,**

voluntarily and intentionally combined, conspired, confederated, and agreed with each other and others known and unknown to the Grand Jury, to commit the following offense against the United States:

7

(a)    Having devised and intended to devise a scheme and artifice to defraud and obtain money and property by means of materially false and fraudulent pretenses and representations and for the purpose of executing such scheme, and attempting to do so, did knowingly cause and attempt to cause to be transmitted by means of wire communication in interstate commerce, writings, signs, and signals in the form of interstate electronic communications, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1349.

<u>**Manner and Means of the Scheme and the Conspiracy**</u>

31.    The primary purpose of the conspiracy was to execute a wire fraud scheme and artifice to defraud and obtain money, specifically, pandemic assistance dollars from lenders, by means of materially false and fraudulent pretenses, representations, and promises.

32.    The conspiracy to execute a wire fraud scheme and artifice to defraud and obtain money and property by means of materially false and fraudulent pretenses, representations, and promises was carried out by Defendants in the following manner:

**I.    Defendant Sparks and Defendant Oboite Unlawfully Obtained At Least $200,000 in Pandemic Assistance Money Through Fraudulent Loan Applications Submitted in Their Own Names.**

33.    As part of the conspiracy, Defendant Sparks and Defendant Oboite both submitted or caused to be submitted fraudulent loan applications for pandemic assistance dollars in their own names. Defendant Oboite taught Defendant Sparks and Defendant McClain how to submit fraudulent PPP loan applications and he coached them through the process of obtaining fraudulent PPP loans based on his experience obtaining fraudulent PPP loans for himself.

A.    **Defendant Oboite's Fraudulent PPP Loans**

34.    Specifically, in furtherance of the scheme to defraud, on or about August 5, 2020, Defendant Oboite submitted a fraudulent sole proprietor PPP loan application to Cross River Bank, a participating PPP lender. In his fraudulent PPP loan application, Defendant Oboite inflated his average monthly payroll that he purportedly made as a "consultant" to receive the maximum amount in his PPP loan. Among other material misrepresentations, Defendant Oboite also falsely and fraudulently represented in that same PPP loan application that he was not "an owner of any other business." In truth and fact, as Defendant Oboite knew full well, Defendant Oboite was the 100% owner of Angels Management Group, which had already received a previous PPP loan. In support of his fraudulent PPP loan application, Defendant Oboite also submitted a false and fraudulent Schedule C, which included gross receipts that he did not earn as a consultant sole proprietor. Based on Defendant Oboite's material misrepresentations, Cross River Bank wired approximately $20,833.32 into Defendant Oboite's bank account.

35.    Furthermore, on or about February 23, 2021, Defendant Oboite submitted another fraudulent sole proprietor PPP loan application to Cross River Bank. As he had done in his previous fraudulent PPP loan application, Defendant Oboite once again inflated his average monthly payroll that he purportedly made as a "consultant" to receive the maximum amount in this PPP loan. In addition, Defendant Oboite also falsely and fraudulently represented that he was not "an owner of any other business." Further, in support of his fraudulent PPP loan application, Defendant Oboite submitted a false and fraudulent Schedule C, which included gross receipts that he did not earn as a consultant sole proprietor. Based on Defendant Oboite's material misrepresentations, Cross River Bank wired an additional $20,833.32 into Defendant Oboite's bank account.

9

### B.      Defendant Sparks' Fraudulent PPP Loans

36.     After obtaining his own fraudulent PPP loans, Defendant Oboite coached Defendant McClain and Defendant Sparks on how to obtain fraudulent PPP loans under Defendant Sparks' name. For his work, Defendant Oboite expected a cut of the proceeds that Defendant Sparks received as a result of Defendant Sparks' fraudulent PPP loan applications. To obtain the proceeds of his fraudulent PPP loans, Defendant Sparks had Defendant McClain create and submit Defendant Sparks' fraudulent PPP loan applications in furtherance of the scheme to defraud.

37.     Specifically, on or about April 2, 2021, in the Eastern District of Missouri—and with the assistance of Defendant Oboite and Defendant McClain—Defendant Sparks submitted or caused to be submitted a fraudulent sole proprietor PPP loan application. In that fraudulent PPP loan application, Defendant Sparks falsely and fraudulently represented that he made $98,700 in gross annual income from a sole proprietorship consulting business that he purportedly owned. In truth and fact, however, Defendant Sparks did not own a sole proprietorship consulting business. Also, in that same fraudulent PPP loan application, Defendant Sparks falsely and fraudulently stated that he was not subject to a felony indictment. In truth and fact, as Defendant Sparks knew full well, he had been subject to an indictment for a felony offense since on or about October 30, 2019. In addition, in support of his fraudulent PPP loan application, Defendant Sparks submitted or caused to be submitted a false and fraudulent Schedule C—which was never filed with the IRS—and which included gross receipts that he did not earn from a sole proprietorship consulting business. To verify his identity as a PPP loan applicant, Defendant Sparks was required to upload selfies during the PPP loan processing period. As required, Defendant Sparks took and uploaded the following selfies, which he took at Faith Walk Ministry, in the Eastern District of Missouri.

**Selfies**



Based on Defendant Sparks' material misrepresentations, the participating PPP lender (Fountainhead SBF LLC) wired $20,562.00 into Defendant Sparks' bank account on or about April 21, 2021.

38. On or about April 22, 2021, in the Eastern District of Missouri—and with the assistance of Defendant Oboite and Defendant McClain—Defendant Sparks submitted or caused to be submitted another fraudulent sole proprietor PPP loan application. In that fraudulent PPP loan application, Defendant Sparks once again falsely and fraudulently represented that he made $98,700 in annual gross income from a sole proprietorship consulting business that he purportedly owned. In truth and fact, however, Defendant Sparks did not own a sole proprietorship consulting business. Also, in that same fraudulent PPP loan application, Defendant Sparks falsely and fraudulently stated that he was not subject to a felony indictment. In truth and fact, as Defendant Sparks knew full well, he had been subject to an indictment for a felony offense since on or about October 30, 2019. In addition, as a supporting document to his fraudulent PPP loan application, Defendant Sparks submitted or caused to be submitted a false and fraudulent Schedule C—which was never filed with the IRS—and which included gross receipts that he did not earn from a consulting sole proprietorship business. Based on Defendant Sparks' material misrepresentations, the participating PPP lender (Benworth Capital Partners, LLC) wired $20,562.00 into Defendant Sparks' bank account on or about May 26, 2021.

11

## C.    Defendant Sparks' Fraudulent EIDL Loan

39.    Also in furtherance of the scheme to defraud, on or about June 16, 2020, in the Eastern District of Missouri—and with the assistance of Defendant McClain—Defendant Sparks submitted or caused to be submitted a fraudulent EIDL application to the SBA for an entity called The Miracle Place International. In his fraudulent EIDL application for The Miracle Place International Church, Defendant Sparks vastly inflated the entity's gross annual revenue. In that same fraudulent EIDL application, Defendant Sparks falsely and fraudulently represented that he was not "presently subject to an indictment[.]" In truth and fact, as Defendant Sparks well knew, he was subject to a felony indictment that was returned on or about October 30, 2019. Among other material misrepresentations in the EIDL application, Defendant Sparks also falsely and fraudulently represented that he had not been "placed on any form of parole" within the last five years for a felony offense. In truth and fact, as Defendant Sparks well knew, he was placed on parole for a separate felony offense on or about July 26, 2017. Based on Defendant Sparks' material misrepresentations, the SBA wired $147,900 into Defendant Sparks' bank account on or about July 6, 2020. Instead of using the EIDL money for legitimate business expenses, Defendant Sparks used the proceeds of his fraud to make payments to Gold Coast Bentley (a luxury car dealership in Chicago, Illinois) and to purchase designer shoes, among other impermissible expenses.

40.    All told, between 2020 and 2021, Defendant Sparks and Defendant Oboite received at least $200,000 in pandemic assistance money by submitting—or causing to be submitted—fraudulent loan applications in their own names.

**II.    Defendant Sparks and his Co-Conspirators Unlawfully Obtained Over One Million Dollars in PPP Loan Proceeds Through Fraudulent Loan Applications Submitted in the Names of Defendant Sparks' Parishioners and Associates.**

41.    To execute the scheme to defraud, Defendant Sparks obtained—and then subsequently exploited—his position of authority as a minister at Faith Walk Ministry. In that position of authority, Defendant Sparks worked to secure the trust of Faith Walk Ministry parishioner so that he could have fraudulent PPP loans taken out in their names and enrich himself with the proceeds. In an attempt to conceal his fraud scheme from many of his parishioners, Defendant Sparks often told them that he was an "Apostle" of God, whose decisions and decrees could not be questioned. Defendant Sparks also had Defendant H. Long assure Faith Walk Ministry parishioners that Defendant Sparks could be trusted with their personal and financial information.

42.    To have fraudulent PPP loans taken out in the names of his parishioners and associates, Defendant Sparks and his co-conspirators obtained those individuals' personal and financial information through various lies and falsehoods. For instance, Defendant Sparks often told parishioners that they needed to provide their information so that his co-conspirators could fix their credit scores. On other occasions, Defendant Sparks told parishioners that his co-conspirators needed their information to secure funding for Faith Walk Ministry. Despite these representations, Defendant Sparks and his co-conspirators used Faith Walk Ministry parishioners' personal and financial information to take out fraudulent PPP loans in their names for the personal enrichment of Defendant Sparks and Defendant Oboite.

43.    As another step in the scheme to defraud, Defendant Sparks directed Defendant McClain to create email addresses in the names of his parishioners and associates. As directed, Defendant McClain created those email addresses so that the email addresses could be used to

13

apply for the fraudulent loans without alerting parishioners to the full scope of the fraud. At the direction of Defendant Sparks, Defendant Hardin regularly checked the parishioners' email accounts that were created by Defendant McClain.

44.    As another step in the fraud scheme, Defendant Sparks encouraged Faith Walk Ministry parishioners to open new bank accounts at Navy Federal Credit Union, where the fraudulent PPP loan proceeds were later deposited at his and Defendant Oboite's direction. Additionally, Defendant Sparks commissioned the creation of false and fraudulent tax documents in the names of his parishioners and associates. Those fraudulent tax documents, which were later submitted to the lenders in support of the fraudulent PPP loans, included fictitious earnings for Defendant Sparks' parishioners and associates.

A.    **Submission of the Fraudulent PPP Loans**

45.    To execute the fraudulent scheme, Defendant Sparks and Defendant Oboite directed Defendant McClain and Defendant Hardin to submit the fraudulent sole proprietorship PPP loans in the names of Defendant Sparks' parishioners and associates. Defendant Oboite specifically coached Defendant McClain on how to fill out these fraudulent PPP loan applications. As directed by Defendant Sparks, either Defendant McClain or Defendant Hardin submitted or substantially assisted in the submission of fraudulent sole proprietorship PPP loan applications in the names of Faith Walk Ministry parishioners. Each of those fraudulent PPP loan applications listed businesses that did not exist or included revenues that were never earned. The vast majority of the fraudulent PPP loans completed by Defendant McClain or Defendant Hardin—including the fraudulent PPP loans submitted in their names—were submitted via interstate wiring from Faith Walk Ministry, within the Eastern District of Missouri.

14

46.    Based on the material misrepresentations included in the dozens of fraudulent PPP loan applications that were completed and submitted at the direction of Defendant Sparks and Defendant Oboite, participating PPP lenders paid out more than one million dollars in government-backed funds. Defendant Oboite—for his role in the conspiracy—expected to receive a percentage of the fraudulent PPP loan proceeds.

### B.    Defendant J. Long's Fraudulent PPP Loan

47.    In furtherance of the scheme to defraud, Defendant J. Long—a parishioner at Faith Walk Ministry—caused the submission of a fraudulent sole proprietorship PPP loan in his own name on or about April 2, 2021. Like many of the fraudulent Faith Walk Ministry PPP loan applications, Defendant J. Long's application was for a "consultant" business that did not exist. Defendant J. Long personally participated in the application process by signing the promissory note from his personal residence, within the Eastern District of Missouri. In addition, Defendant J. Long pocketed at least $8,000 of the PPP loan proceeds for himself.

### C.    Fraudulent PPP Loans for Businesses Purportedly Owned by Defendant H. Long

48.    In addition to taking out fraudulent sole proprietorship PPP loans in the names of Defendant Sparks' parishioners and associates, Defendant Sparks and Defendant Oboite also directed Defendant McClain and Defendant H. Long to submit fraudulent PPP loan applications for businesses purportedly owned by Defendant H. Long. Those businesses included Jabin II and Faith Walk Ministry Community Development Corporation.

49.    On or about April 4, 2021, Defendant McClain—with the assistance of Defendant H. Long—submitted a fraudulent PPP loan application for Jabin II. Included in the fraudulent PPP loan application for Jabin II was the material misrepresentation that the company paid an average monthly payroll of $64,657.00. In truth and fact, as Defendant McClain and Defendant H. Long

15

well knew, Jabin II did not have any payroll expenses. In support of the fraudulent PPP loan application that Defendant McClain submitted for Jabin II, Defendant McClain also submitted false and fraudulent tax forms, which were approved and signed by Defendant H. Long. Included in Defendant H. Long's false and fraudulent tax documents for Jabin II was the misrepresentation that Jabin II earned $1,989,000.00 in gross receipts or sales during 2019. In truth and fact, as Defendant H. Long and Defendant McClain well knew, this figure was vastly inflated. Despite Defendant H. Long's knowledge that the Jabin II tax documents were false and fraudulent, he approved and signed those documents to ensure that the lender provided Jabin II with a substantial PPP loan. Based on the material misrepresentations made by Defendant H. Long and Defendant McClain as part of the Jabin II PPP loan application, the participating PPP lender (TAB Bank) wired a total of $161,642.00 into a bank account controlled by Defendant H. Long.

50.    Defendant McClain—with the assistance of Defendant H. Long—submitted a similar fraudulent PPP loan application for Faith Walk Community Development Corporation on or about March 26, 2021. Included in the fraudulent PPP loan application for Faith Walk Community Development Corporation was the material misrepresentation that the company paid an average monthly payroll of $64,882.00. In truth and fact, as Defendant McClain and Defendant H. Long well knew, Faith Walk Community Development Corporation did not have any payroll expenses. Based on the material misrepresentations made by Defendant H. Long and Defendant McClain as part of the Faith Walk Community Development Corporation PPP loan application, the participating PPP lender (Customers Bank) wired a total of $162,204.00 into a bank account controlled by Defendant H. Long.

**D.    Defendant Oboite and His Co-Conspirators' Efforts to Falsely Convince Navy Federal Credit Union that the Fraudulent PPP Loans Were Legitimate**

16

51.     After Faith Walk Ministry parishioners received the fraudulent PPP loan proceeds in the Navy Federal Credit Union bank accounts they had opened at Defendant Sparks' direction, Navy Federal Credit Union froze several of the parishioners' bank accounts based on suspected fraud. In an effort to conceal the scheme to defraud and reopen the parishioners' bank accounts, Defendant Sparks and Defendant Oboite coached their co-conspirators on the lies that they should tell if Navy Federal Credit Union inquired into their PPP loans.

52.     In furtherance of the conspiracy and scheme, Defendant Oboite sent Defendant Sparks false and fraudulent "scripts" for co-conspirators to read to Navy Federal Credit Union in an effort to retrieve the fraud proceeds. Those scripts were written and designed by Defendant Oboite to have his co-conspirators persuade Navy Federal Credit Union that the PPP loans in their names were validly "approved" by the lenders and that the loans were not fraudulently obtained.

53.     For example, on or about June 14, 2021, Defendant Oboite emailed a specific "script" for Defendant Shefte (a parishioner who received a fraudulent PPP loan) to use when she spoke with a representative of Navy Federal Credit Union. In that fraudulent script, Defendant Oboite directed Defendant Shefte to tell the bank that she was the person who applied for the PPP loan for her business. Defendant Oboite also directed Defendant Shefte to tell the bank that she's had her business for "about 3 years." To further convince the bank to release the fraudulent PPP money, Defendant Oboite also directed Defendant Shefte to tell that bank that her PPP loan application was "approved" by the lender.

54.     On or about June 16, 2021 (two days after Defendant Oboite sent the fraudulent script referenced immediately above), Defendant Shefte spoke with a representative of Navy Federal Credit Union. Following the script, Defendant Shefte told the bank's representative that she submitted her PPP loan application for her business. Despite the fact that Defendant Shefte's

17

PPP loan application falsely and fraudulently stated that she ran an administrative consultant business that earned $89,500 in 2019, Defendant Shefte attempted to convince the representative of Navy Federal Credit Union that her PPP loan was not fraudulently obtained.

55.    On or about that same date—June 16, 2021—Defendant West also spoke with a representative of Navy Federal Credit Union. During that conversation, Defendant West told the bank's representative that she submitted her PPP loan application for her business. Despite the fact that Defendant West's PPP loan application falsely and fraudulently stated that she ran an administrative management business that earned $90,200 in 2019, Defendant West attempted to convince the representative of Navy Federal Credit Union that her PPP loan was not fraudulently obtained.

56.    Defendant N. Long also spoke with a representative of Navy Federal Credit Union, specifically on or about June 9, 2021. During that conversation, Defendant N. Long told the bank's representative that her PPP loans were for her businesses. Defendant N. Long also told the bank's representative that she should not be required to provide the bank with the documentation supporting her PPP loans because her loans were "approved."

57.    In addition to sending fraudulent scripts to co-conspirators, Defendant Oboite also provided false and fraudulent tax documents to co-conspirators for the purpose of convincing Navy Federal Credit Union to unfreeze the PPP fraud proceeds. For example, on June 11, 2021, Defendant Oboite emailed Defendant Sparks a fraudulent tax document in the name of Defendant N. Long. That fraudulent tax document falsely represented that Defendant N. Long ran a management consulting business that earned $66,550 in 2020. Three days later—on June 14, 2021—Defendant N. Long sent that fraudulent tax document to Navy Federal Credit Union in an attempt to convince the bank to grant her access to the proceeds of her fraudulent PPP loans.

18

58.    After Faith Walk Ministry parishioners received the unfrozen fraudulent PPP loan proceeds in their bank accounts, Defendant Sparks and others directed them on where to send the proceeds. Unbeknownst to many Faith Walk Ministry parishioners, Defendant Sparks ultimately received hundreds of thousands of dollars from the fraudulent PPP loans that were submitted in their names. Instead of providing that money to Faith Walk Ministry or his parishioners, Defendant Sparks spent the fraudulently obtained loan proceeds on himself—paying for designer clothing, luxury merchandise, and expensive cars.

59.    When many Faith Walk Ministry parishioners questioned Defendant H. Long about the loans proceeds in their bank accounts or where the money was going, Defendant H. Long assured those parishioners that they should trust Defendant Sparks. When those same questions were posed by parishioners to Defendant Sparks, he would threaten parishioners with "curses from God." Defendant Sparks also regularly scolded parishioners who inquired about his fraudulent scheme for questioning a "man of God."

## COUNTS TWO – TWELVE
### (Wire Fraud: 18 U.S.C. § 1343)

60.    Each of the above allegations is hereby incorporated by reference as if fully set forth herein.

61.    Beginning by at least on or about September 17, 2018, and continuing through at least on or about July 17, 2024, in the Eastern District of Missouri, the defendants listed below, with the intent to defraud, devised and intended to devise a scheme and artifice to defraud lenders and to obtain money and property from lenders by means of material false and fraudulent pretenses, representations, and promises, as described further herein.

62.    On or about the dates set forth below, in the Eastern District of Missouri, and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and

19

obtain money and property by means of false and fraudulent pretenses, representations and promises and for the purpose of executing the same, the defendants specified below did knowingly transmit and cause to be transmitted by means of wire communication in and affecting interstate commerce, certain writings, signs, signals, pictures, or sounds, to wit:

| | | | |
|---|---|---|---|
| 2 | **Defendant Sparks** | 6/16/2020 | An electronic EIDL application submitted for The Miracle Place International through an out-of-state server from the Eastern District of Missouri. |
| 3 | **Defendant Sparks** **Defendant Oboite** **Defendant McClain** **Defendant H. Long** | 4/1/2021 | An electronic PPP loan application submitted for Defendant H. Long through an out-of-state server from the Eastern District of Missouri. |
| 4 | **Defendant Sparks** **Defendant Oboite** **Defendant McClain** **Defendant J. Long** | 4/2/2021 | An electronic PPP loan application submitted for Defendant J. Long through an out-of-state server from the Eastern District of Missouri. |
| 5 | **Defendant Sparks** **Defendant Oboite** **Defendant McClain** | 4/2/2021 | An electronic PPP loan application submitted for Defendant Sparks through an out-of-state server from the Eastern District of Missouri. |
| 6 | **Defendant Sparks** **Defendant Oboite** **Defendant McClain** | 4/2/2021 | An electronic PPP loan application submitted for Parishioner J.F. through an out-of-state server from the Eastern District of Missouri. |
| 7 | **Defendant Sparks** **Defendant Oboite** | 4/2/2021 | An electronic PPP loan application submitted for Defendant West through an out-of-state server from the Eastern District of Missouri. |
| 8 | **Defendant Sparks** **Defendant Oboite** **Defendant McClain** | 4/3/2021 | An electronic PPP loan application submitted by Defendant McClain in her own name, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 9 | **Defendant Sparks** **Defendant Oboite** **Defendant McClain** **Defendant H. Long** | 4/4/2021 | An electronic PPP loan application for Jabin II Inc., which traveled through an out-of-state server from the Eastern District of Missouri. |
| 10 | **Defendant Sparks** **Defendant Oboite** | 4/5/2021 | An electronic PPP loan application submitted for Defendant Shefte through an out-of-state server from the Eastern District of Missouri. |
| 11 | **Defendant Sparks** **Defendant Oboite** **Defendant McClain** | 4/10/2021 | An electronic PPP loan application submitted for Parishioner R.L. through an out-of-state server from the Eastern District of Missouri. |

20

| 12 | Defendant Sparks Defendant Oboite Defendant N. Long | 6/14/2021 | A fraudulent tax document in the name of Defendant N. Long faxed to Navy Federal Credit Union from the Eastern District of Missouri. |
|----|------|------|------|

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS THIRTEEN – SIXTEEN
### (Wire Fraud: 18 U.S.C. § 1343)

63.    Each of the above allegations is hereby incorporated by reference as if fully set forth herein.

64.    Beginning by at least in or about January 2020, and continuing through at least in or about July 2024, in the Eastern District of Missouri, and elsewhere, the defendants,

**KENNETH C. SPARKS III,
TERRANCE A. KWADE, and
MICHAEL S. MCCLAIN**

with the intent to defraud, devised and intended to devise a scheme and artifice to defraud lending institutions and to obtain money and property from lending institutions by means of material false and fraudulent pretenses, representations, and promises, as described further herein.

65.    Defendant Sparks, Defendant Kwade, and Defendant M.S. McClain undertook the actions detailed below as part of their scheme and artifice to defraud.

I.    **Defendant Sparks and Defendant Kwade Defrauded Lenders Out of Hundreds of Thousands of Dollars By Taking Out Fraudulent Loans in the Names of Defendant Sparks' Parishioners and Associates.**

66.    Defendant Sparks enlisted Defendant Kwade in his effort—as detailed in Defendant Sparks' text messages—to steal "$21 million" from lending institutions by taking out fraudulent loans in the names of his parishioners and associates. Through their efforts to defraud lending institutions, Defendant Sparks and Defendant Kwade agreed that they would "try and squeeze as much [money] out of" Defendant Sparks' parishioners as they could.

21

67.     For his part of the scheme, Defendant Sparks gathered and provided Defendant Kwade with the personal and banking information of his associates and parishioners. After receiving the information for those individuals, Defendant Kwade drafted and submitted to lending institutions fraudulent automobile and personal loan applications in their names. Defendant Sparks and Defendant Kwade also coached several parishioners and associates on what lies to tell if the lending institutions ever inquired into the fraudulent automobile and personal loan applications.

68.     After the lending institutions paid out their funds in response to Defendant Kwade's fraudulent applications, Defendant Sparks took the vast majority of the fraud proceeds for himself. As his payment, Defendant Kwade took 10% of the fraud proceeds, plus any additional costs for creating fictitious bank statements and pay stubs in the names of Defendant Sparks' parishioners and associates. Defendant Kwade often submitted those fictitious bank statements and pay stubs in support of the fraudulent loan applications.

69.     To execute his scheme, Defendant Sparks took advantage of many of his parishioners by having fraudulent loans taken out in their names—often without their full understanding and consent. Defendant Sparks specifically singled out many of his parishioners and used them to commit his fraud because—as he stated to Defendant Kwade—he thought that they were "retarded and dyslexic and they don't know how to handle things."

70.     Certain individuals—like Defendant M.S. McClain (the husband of Defendant McClain)—willingly allowed their names to be used in fraudulent loan applications, and knowingly and intentionally participated in Defendant Sparks' scheme to defraud lending institutions. Defendant M.S. McClain allowed Defendant Sparks and Defendant Kwade to submit multiple fraudulent loan applications in his name. After Defendant Kwade submitted the fraudulent loan applications in the name of Defendant M.S. McClain, Defendant Kwade coached Defendant

22

M.S. McClain on the lies that he needed to tell the lending institutions to obtain and keep the fraudulent loan proceeds. On one occasion—on or about January 24, 2022—Defendant Kwade instructed Defendant M.S. McClain to falsely represent to a lending institution that he made $75,000 per year as an accountant.

71.    Many of the fraudulent loan applications submitted by Defendant Kwade at the direction of Defendant Sparks were fraudulent automobile loan applications that he submitted to Navy Federal Credit Union. In each of his fraudulent automobile loan applications, Defendant Kwade falsely represented that the borrower (a parishioner or associate of Defendant Sparks) needed a loan to purchase a specific automobile. In truth and fact, as Defendant Sparks and Defendant Kwade knew full well, the purported borrowers were not, in fact, purchasing the listed automobiles. Instead of using the loan proceeds to purchase the listed automobiles, Defendant Sparks and Defendant Kwade used the loan proceeds to enrich themselves.

72.    In all, Defendant Sparks and Defendant Kwade took out at least ten fraudulent automobile loans for a total of $460,000.00. To obtain those fraudulent loans, Defendant Kwade, at the direction of Defendant Sparks, sent each of the fraudulent automobile loan applications listed below to Navy Federal Credit Union.

| Loan Application Date | Borrower's Name | Listed Automobile | Amount Paid |
|---|---|---|---|
| 11/20/2021 | Defendant H. Long | 2021 BMW X5 | $  50,000.00 |
| 11/20/2021 | Parishioner D.L. | 2018 BMW X5 | $  40,000.00 |
| 12/19/2021 | Associate A.Y. | 2021 Cadillac XT6 | $  50,000.00 |
| 12/21/2021 | Associate M.G.Y. | 2017 BMW X5 | $  30,000.00 |
| 12/21/2021 | Parishioner J.F. | 2021 BMW X5 | $  60,000.00 |
| 12/21/2021 | Defendant McClain | 2021 Lincoln Aviator | $  40,000.00 |
| 12/22/2021 | Associate J.G.Y. | 2020 Chevy Silverado | $  30,000.00 |
| 12/22/2021 | Parishioner J.H. | 2021 BMW X1 | $  30,000.00 |
| 1/21/2022 | Defendant M.S. McClain | 2021 GMC Sierra | $  60,000.00 |
| 2/25/2022 | Defendant West | 2021 GMC Yukon XL | $  70,000.00 |

23

73. Defendant Kwade submitted the fraudulent automobile loan applications listed above from his residence in the Northern District of Georgia, during his trips overseas to Ghana, or from other locations that he frequented in the United States.

74. After Defendant M.S. McClain received the fraudulent automobile loan listed above, he was interviewed by a representative from Navy Federal Credit Union. During that interview, on or about March 14, 2022, Defendant M.S. McClain falsely told the Navy Federal Credit Union representative that he applied for the automobile loan without anyone else's assistance. But, when Defendant M.S. McClain was asked about his employment listed in the loan application, Defendant M.S. McClain was unable to correctly answer the question. Additionally, Defendant M.S. McClain falsely represented to the Navy Federal Credit Union representative that he had in his possession the 2021 GMC Sierra that was the subject of his fraudulent loan application. In truth and fact, however, Defendant M.S. McClain did not purchase that automobile.

## II. Interstate Wire Transmissions in Furtherance of the Scheme to Defraud

75. On or about the dates set forth below, within the Eastern District of Missouri, for the purpose of executing the above-described scheme and artifice to defraud and obtain money and property by means of false and fraudulent pretenses, representations and promises and for the purpose of executing the same, the defendants listed below did knowingly transmit and cause to be transmitted by means of wire communication in and affecting interstate commerce, certain writings, signs, signals, pictures, or sounds, to wit:

| | | | |
|---|---|---|---|
| 13 | **Defendant Sparks** **Defendant Kwade** | 12/21/2021 | Defendant Sparks' text message to Defendant Kwade, which included Parishioner J.F.'s banking information. |
| 14 | **Defendant Sparks** **Defendant Kwade** | 12/21/2021 | Defendant Sparks' text message to Defendant Kwade, which included Defendant McClain's banking information. |

24

| 15 | **Defendant Sparks** **Defendant Kwade** | 12/22/2021 | Defendant Sparks' text message to Defendant Kwade providing instructions on what to include in the automobile loan application for Parishioner J.H. |
| 16 | **Defendant Sparks** **Defendant Kwade** **Defendant M.S. McClain** | 3/14/2022 | Defendant M.S. McClain's phone conversation with a Navy Federal Credit Union Representative. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS SEVENTEEN – NINETEEN
### (Aggravated Identity Theft: 18 U.S.C. § 1028A)

76.     Each of the above allegations is hereby incorporated by reference as if fully set forth herein.

77.     On or about the dates listed below, within the Eastern District of Missouri, the defendants listed below did knowingly use, without lawful authority, a means of identification of another person during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to wit, wire fraud, in violation of 18 U.S.C. § 1343, knowing that the means of identification belonged to another actual person, as described below, in that the defendants listed below used or caused to be used the means of identification listed below in order to submit or cause to be submitted fraudulent loan applications.

| | | | |
|----|----|----|----|
| 17 | **Defendant Sparks** | 4/2/2021 | The name of Parishioner J.F. included in a PPP loan application. |
| 18 | **Defendant Sparks** | 4/10/2021 | The name of Parishioner R.L. included in a PPP loan application. |
| 19 | **Defendant Sparks** **Defendant Kwade** | 12/22/2021 | The name of Parishioner J.F. included in an automobile loan application. |

All in violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.

25

## COUNTS TWENTY – THIRTY-THREE
### (Money Laundering: 18 U.S.C. § 1956(a)(1)(B)(i))

78.    Each of the above allegations is hereby incorporated by reference as if fully set forth herein.

79.    During the conspiracy and scheme to defraud, Defendant Sparks required his parishioners and associates to provide him with the vast majority of the PPP loan fraud proceeds. To obtain the fraud proceeds, Defendant Sparks directed his parishioners and associates to provide him with the proceeds in signed checks with no listed payee. After receiving those checks, Defendant Sparks had the payees for those checks listed in the name of companies that he owned, including The Miracle Place International Church and Royal European Day Spa. To further disguise the nature and ownership of the fraud proceeds, Defendant Sparks deposited the checks into accounts held by him in the name of his businesses.

80.    On or about the dates listed below, within the Eastern District of Missouri, the defendant,

### KENNETH C. SPARKS III,

did knowingly conduct and attempt to conduct the financial transactions listed below affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the transactions were designed in whole and in part to conceal and disguise, the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

26

| | | |
|---|---|---|
| 20 | 5/24/2021 | Deposit of a $9,604.00 check containing PPP loan proceeds from Defendant Hardin into a Regions bank account controlled by Defendant Sparks in the name of a company of his called Royal European Day Spa. |
| 21 | 6/1/2021 | Deposit of a $9,218.50 check containing PPP loan proceeds from Parishioner D.L. into a BMO Harris bank account controlled by Defendant Sparks in the name of a company of his called The Miracle Place International Church. |
| 22 | 5/24/2021 | Deposit of a $9,218.50 check containing PPP loan proceeds from Parishioner D.L. into a Regions bank account controlled by Defendant Sparks in the name of a company of his called Royal European Day Spa. |
| 23 | 5/24/2021 | Deposit of a $9,114.50 check containing PPP loan proceeds from Parishioner E.F. into a Regions bank account controlled by Defendant Sparks in the name of a company of his called Royal European Day Spa. |
| 24 | 6/1/2021 | Deposit of a $9,114.50 check containing PPP loan proceeds from Parishioner E.F. into a Regions bank account controlled by Defendant Sparks in the name of a company of his called The Miracle Place International Church. |
| 25 | 6/1/2021 | Deposit of a $9,447.50 check containing PPP loan proceeds from Parishioner H.L. into a BMO Harris bank account controlled by Defendant Sparks in the name of a company of his called The Miracle Place International Church. |
| 26 | 5/24/2021 | Deposit of a $9,614.50 check containing PPP loan proceeds from Defendant J. Long into a Regions bank account controlled by Defendant Sparks in the name of a company of his called Royal European Day Spa. |
| 27 | 5/24/2021 | Deposit of a $10,000.00 check containing PPP loan proceeds from Parishioner J.L. into a Regions bank account controlled by Defendant Sparks in the name of a company of his called Royal European Day Spa. |
| 28 | 5/24/2021 | Deposit of a $9,322.50 check containing PPP loan proceeds from Defendant Shefte into a Regions bank account controlled by Defendant Sparks in the name of a company of his called Royal European Day Spa. |
| 29 | 6/1/2021 | Deposit of a $9,322.50 check containing PPP loan proceeds from Defendant Shefte into a Regions bank account controlled by Defendant Sparks in the name of a company of his called The Miracle Place International Church. |
| 30 | 5/24/2021 | Deposit of a $9,906.00 check containing PPP loan proceeds from Defendant M. McClain into a Regions bank account controlled by Defendant Sparks in the name of a company of his called Royal European Day Spa. |
| 31 | 5/24/2021 | Deposit of a $ 9,375.00 check containing PPP loan proceeds from Defendant N. Long into a Regions bank account controlled by Defendant Sparks in the name of a company of his called Royal European Day Spa. |
| 32 | 6/1/2021 | Deposit of a $9,395.00 check containing PPP loan proceeds from Defendant West into a Regions bank account controlled by Defendant |

27

| | | |
|---|---|---|
| | | Sparks in the name of a company of his called The Miracle Place International Church. |
| 33 | 5/24/2021 | Deposit of a $9,395.50 check containing PPP loan proceeds from Defendant West into a Regions bank account controlled by Defendant Sparks in the name of a company of his called Royal European Day Spa. |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## FORFEITURE ALLEGATION

The Grand Jury further alleges there is probable cause that:

1.     Pursuant to Title 18, United States Code, Sections 982(a)(2), upon conviction of an offense in violation of Title 18, United States Code, Sections 1343 and 1349, as set forth in Counts One through Sixteen, the defendant shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of such violation.  Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to such violation.

2.     Pursuant to Title 18, United States Code, Sections 982(a), upon conviction of an offense in violation of Title 18, United States Code, Section 1956, as set forth in Counts Twenty through Thirty-Three, the defendant shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property.  Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, involved in such offense, or any property traceable to such property.

3.     If any of the property described above, as a result of any act or omission of the defendant:

> a.     cannot be located upon the exercise of due diligence;
> b.     has been transferred or sold to, or deposited with, a third party;
> c.     has been placed beyond the jurisdiction of the court;
> d.     has been substantially diminished in value; or
> e.     has been commingled with other property which cannot be divided without

28

difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to

Title 21, United States Code, Section 853(p).

A TRUE BILL.

_____
FOREPERSON

SAYLER A. FLEMING
United States Attorney


_____
DEREK J. WISEMAN, #67257MO
Assistant United States Attorney

29