UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:24-cr-00374-JAR |
| | ) | |
| JEFFREY OBOITE, | ) | |
| | ) | |
| Defendant. | ) | |

# GUILTY PLEA AGREEMENT

Come now the parties and hereby agree, as follows:

**1. PARTIES:**

The parties are the defendant Jeffrey Oboite, represented by defense counsel Todd A. Spodek, and the United States of America (hereinafter "United States" or "Government"), represented by the Office of the United States Attorney for the Eastern District of Missouri. This agreement does not, and is not intended to, bind any governmental office or agency other than the United States Attorney for the Eastern District of Missouri. The Court is neither a party to nor bound by this agreement.

**2. GUILTY PLEA:**

Pursuant to Rule 11(c)(1)(A), Federal Rules of Criminal Procedure, in exchange for the defendant's voluntary plea of guilty to Count 1 and Count 3 of the Superseding Indictment, the United States agrees to dismiss the remaining counts against this defendant at the time of the sentencing. In addition, the United States agrees that no further federal prosecution will be brought in this District relative to the defendant's wire fraud scheme and conspiracy described in the

Indictment, of which the Government is aware at this time. In addition, the parties agree that the U.S. Sentencing Guidelines Total Offense Level analysis agreed to by the parties herein is the result of negotiation and led, in part, to the guilty plea. The parties further agree that the United States will request a sentence within the U.S. Sentencing Guidelines range (combination of Total Offense Level and Criminal History Category) ultimately determined by the Court pursuant to any chapter of the Guidelines and Title 18, United States Code, Section 3553(a). The parties further agree that Defendant may request a sentence above or below the U.S. Sentencing Guidelines range (combination of Total Offense Level and Criminal History Category) ultimately determined by the Court pursuant to any chapter of the Guidelines, Title 18, United States Code, Section 3553, or any other provision or rule of law not addressed herein.

**3. ELEMENTS:**

As to Count 1, the defendant admits to knowingly violating Title 18, United States Code, Section 1349, and admits there is a factual basis for the plea and further fully understands that the elements of the crime are:

**One**, two or more persons, including Defendant, reached an agreement or came to an understanding to devise, make up, or participate in a scheme to commit wire fraud;

**Two**, Defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect; and

**Three**, at the time Defendants joined in the agreement or understanding, Defendant knew the purpose of the agreement or understanding.

As to Count 3, the defendant admits to knowingly violating Title 18, United States Code, Section 1343, and admits there is a factual basis for the plea and further fully understands that the elements of the crime are:

**One**, Defendant voluntarily and intentionally devised or participated in a scheme to obtain money by means of material false representations or promises, which scheme is described in the indictment;

**Two**, Defendant did so with intent to defraud; and

**Three**, Defendant caused to be used an interstate wire communication, that is the wirings in the indictment, in furtherance of, or in an attempt to carry out, some essential step in the scheme.

**4. <u>FACTS</u>:**

The parties agree that the facts in this case are as follows and that the Government would prove these facts beyond a reasonable doubt if the case were to go to trial. These facts may be considered as relevant conduct pursuant to Section 1B1.3:

During the conspiracy outlined below, Defendant Kenneth C. Sparks III ("Defendant Sparks") and his co-conspirators, including Defendant Jeffrey C. Oboite ("Defendant Oboite") and Defendant Harold G. Long ("Defendant H. Long") used Faith Walk Ministry and other entities to fraudulently obtain over $1 million in taxpayer money that was reserved for struggling small businesses during the pandemic. Instead of using the fraudulently obtained taxpayer dollars for permissible purposes, Defendant Sparks used the funds that he took to compensate his co-conspirators and to purchase designer clothing, luxury merchandise, and expensive cars for himself.

In addition to fraudulently obtaining pandemic assistance dollars, Defendant Sparks and Defendant Terrance A. Kwade ("Defendant Kwade") also executed a scheme to defraud lending institutions out of hundreds of thousands of dollars by taking out fraudulent automobile and personal loans in the names of Defendant Sparks' parishioners and associates.

Beginning in or about September 17, 2018, and continuing through at least in or about July 17, 2024, in the Eastern District of Missouri and elsewhere, the defendants included in the Indictment, including Defendant Sparks, voluntarily and intentionally conspired with each other to commit wire fraud scheme. The conspiracy to execute their wire fraud scheme was carried out by Defendants in the following manner:

## I. Defendant Sparks and Defendant Oboite Unlawfully Obtained At Least $200,000 in Pandemic Assistance Money Through Fraudulent Loan Applications Submitted in Their Own Names.

As part of the conspiracy, Defendant Sparks and Defendant Oboite both submitted or caused to be submitted fraudulent loan applications for pandemic assistance dollars in their own names. Defendant Oboite taught Defendant Sparks and Defendant McClain how to submit fraudulent PPP loan applications and he coached them through the process of obtaining fraudulent PPP loans based on his experience obtaining fraudulent PPP loans for himself.

### A. Defendant Oboite's Fraudulent PPP Loans

Specifically, in furtherance of the scheme to defraud, on or about August 5, 2020, Defendant Oboite submitted a fraudulent sole proprietor PPP loan application to Cross River Bank, a participating PPP lender. In his fraudulent PPP loan application, Defendant Oboite inflated his average monthly payroll that he purportedly made as a "consultant" to receive the maximum amount in his PPP loan. Among other material misrepresentations, Defendant Oboite also falsely

and fraudulently represented in that same PPP loan application that he was not "an owner of any other business." In truth and fact, as Defendant Oboite knew full well, Defendant Oboite was the 100% owner of Angels Management Group, which had already received a previous PPP loan. In support of his fraudulent PPP loan application, Defendant Oboite also submitted a false and fraudulent Schedule C, which included gross receipts that he did not earn as a consultant sole proprietor. Based on Defendant Oboite's material misrepresentations, Cross River Bank wired approximately $20,833.32 into Defendant Oboite's bank account.

Furthermore, on or about February 23, 2021, Defendant Oboite submitted another fraudulent sole proprietor PPP loan application to Cross River Bank. As he had done in his previous fraudulent PPP loan application, Defendant Oboite once again inflated his average monthly payroll that he purportedly made as a "consultant" to receive the maximum amount in this PPP loan. In addition, Defendant Oboite also falsely and fraudulently represented that he was not "an owner of any other business." Further, in support of his fraudulent PPP loan application, Defendant Oboite submitted a false and fraudulent Schedule C, which included gross receipts that he did not earn as a consultant sole proprietor. Based on Defendant Oboite's material misrepresentations, Cross River Bank wired an additional $20,833.32 into Defendant Oboite's bank account.

**B. Defendant Sparks' Fraudulent PPP Loans**

After obtaining his own fraudulent PPP loans, Defendant Oboite coached Defendant McClain and Defendant Sparks on how to obtain fraudulent PPP loans under Defendant Sparks' name. For his work, Defendant Oboite expected a cut of the proceeds that Defendant Sparks received as a result of Defendant Sparks' fraudulent PPP loan applications. To obtain the proceeds

of his fraudulent PPP loans, Defendant Sparks had Defendant McClain create and submit Defendant Sparks' fraudulent PPP loan applications in furtherance of the scheme to defraud.

Specifically, on or about April 2, 2021, in the Eastern District of Missouri—and with the assistance of Defendant Oboite and Defendant McClain—Defendant Sparks submitted or caused to be submitted a fraudulent sole proprietor PPP loan application. In that fraudulent PPP loan application, Defendant Sparks falsely and fraudulently represented that he made $98,700 in gross annual income from a sole proprietorship consulting business that he purportedly owned. In truth and fact, however, Defendant Sparks did not own a sole proprietorship consulting business. Also, in that same fraudulent PPP loan application, Defendant Sparks falsely and fraudulently stated that he was not subject to a felony indictment. In truth and fact, as Defendant Sparks knew full well, he had been subject to an indictment for a felony offense since on or about October 30, 2019. In addition, in support of his fraudulent PPP loan application, Defendant Sparks submitted or caused to be submitted a false and fraudulent Schedule C—which was never filed with the IRS—and which included gross receipts that he did not earn from a sole proprietorship consulting business. To verify his identity as a PPP loan applicant, Defendant Sparks was required to upload selfies during the PPP loan processing period. As required, Defendant Sparks took and uploaded the following selfies, which he took at Faith Walk Ministry, in the Eastern District of Missouri.



Based on Defendant Sparks' material misrepresentations, the participating PPP lender (Fountainhead SBF LLC) wired $20,562.00 into Defendant Sparks' bank account on or about April 21, 2021.

On or about April 22, 2021, in the Eastern District of Missouri—and with the assistance of Defendant Oboite and Defendant McClain—Defendant Sparks submitted or caused to be submitted another fraudulent sole proprietor PPP loan application. In that fraudulent PPP loan application, Defendant Sparks once again falsely and fraudulently represented that he made $98,700 in annual gross income from a sole proprietorship consulting business that he purportedly owned. In truth and fact, however, Defendant Sparks did not own a sole proprietorship consulting business. Also, in that same fraudulent PPP loan application, Defendant Sparks falsely and fraudulently stated that he was not subject to a felony indictment. In truth and fact, as Defendant Sparks knew full well, he had been subject to an indictment for a felony offense since on or about October 30, 2019. In addition, as a supporting document to his fraudulent PPP loan application, Defendant Sparks submitted or caused to be submitted a false and fraudulent Schedule C—which was never filed with the IRS—and which included gross receipts that he did not earn from a consulting sole proprietorship business. Based on Defendant Sparks' material misrepresentations, the participating PPP lender (Benworth Capital Partners, LLC) wired $20,562.00 into Defendant Sparks' bank account on or about May 26, 2021.

**C. Defendant Sparks' Fraudulent EIDL Loan**

Also in furtherance of the scheme to defraud, on or about June 16, 2020, in the Eastern District of Missouri—and with the assistance of Defendant McClain—Defendant Sparks submitted or caused to be submitted a fraudulent EIDL application to the SBA for an entity called

The Miracle Place International. In his fraudulent EIDL application for The Miracle Place International Church, Defendant Sparks vastly inflated the entity's gross annual revenue. In that same fraudulent EIDL application, Defendant Sparks falsely and fraudulently represented that he was not "presently subject to an indictment[.]" In truth and fact, as Defendant Sparks well knew, he was subject to a felony indictment that was returned on or about October 30, 2019. Among other material misrepresentations in the EIDL application, Defendant Sparks also falsely and fraudulently represented that he had not been "placed on any form of parole" within the last five years for a felony offense. In truth and fact, as Defendant Sparks well knew, he was placed on parole for a separate felony offense on or about July 26, 2017. Based on Defendant Sparks' material misrepresentations, the SBA wired $147,900 into Defendant Sparks' bank account on or about July 6, 2020. Instead of using the EIDL money for legitimate business expenses, Defendant Sparks used the proceeds of his fraud to make payments to Gold Coast Bentley (a luxury car dealership in Chicago, Illinois) and to purchase designer shoes, among other impermissible expenses.

All told, between 2020 and 2021, Defendant Sparks and Defendant Oboite received at least $200,000 in pandemic assistance money by submitting—or causing to be submitted—fraudulent loan applications in their own names.

## II. Defendant Sparks and his Co-Conspirators Unlawfully Obtained Over One Million Dollars in PPP Loan Proceeds Through Fraudulent Loan Applications Submitted in the Names of Defendant Sparks' Parishioners and Associates.

To execute the scheme to defraud, Defendant Sparks obtained—and then subsequently exploited—his position of authority as a minister at Faith Walk Ministry. In that position of authority, Defendant Sparks worked to secure the trust of Faith Walk Ministry parishioner so that

he could have fraudulent PPP loans taken out in their names and enrich himself with the proceeds. In an attempt to conceal his fraud scheme from many of his parishioners, Defendant Sparks often told them that he was an "Apostle" of God, whose decisions and decrees could not be questioned. Defendant Sparks also had Defendant H. Long assure Faith Walk Ministry parishioners that Defendant Sparks could be trusted with their personal and financial information.

To have fraudulent PPP loans taken out in the names of his parishioners and associates, Defendant Sparks and his co-conspirators obtained those individuals' personal and financial information through various lies and falsehoods. For instance, Defendant Sparks often told parishioners that they needed to provide their information so that his co-conspirators could fix their credit scores. On other occasions, Defendant Sparks told parishioners that his co-conspirators needed their information to secure funding for Faith Walk Ministry. Despite these representations, Defendant Sparks and his co-conspirators used Faith Walk Ministry parishioners' personal and financial information to take out fraudulent PPP loans in their names for the personal enrichment of Defendant Sparks and Defendant Oboite.

As another step in the scheme to defraud, Defendant Sparks directed Defendant McClain to create email addresses in the names of his parishioners and associates. As directed, Defendant McClain created those email addresses so that the email addresses could be used to apply for the fraudulent loans without alerting parishioners to the full scope of the fraud. At the direction of Defendant Sparks, Defendant Hardin regularly checked the parishioners' email accounts that were created by Defendant McClain.

As another step in the fraud scheme, Defendant Sparks encouraged Faith Walk Ministry parishioners to open new bank accounts at Navy Federal Credit Union, where the fraudulent PPP

loan proceeds were later deposited at his and Defendant Oboite's direction. Additionally, Defendant Sparks commissioned the creation of false and fraudulent tax documents in the names of his parishioners and associates. Those fraudulent tax documents, which were later submitted to the lenders in support of the fraudulent PPP loans, included fictitious earnings for Defendant Sparks' parishioners and associates.

**A. Submission of the Fraudulent PPP Loans**

To execute the fraudulent scheme, Defendant Sparks and Defendant Oboite directed Defendant McClain and Defendant Hardin to submit the fraudulent sole proprietorship PPP loans in the names of Defendant Sparks' parishioners and associates. Defendant Oboite specifically coached Defendant McClain on how to fill out these fraudulent PPP loan applications. As directed by Defendant Sparks, either Defendant McClain or Defendant Hardin submitted or substantially assisted in the submission of fraudulent sole proprietorship PPP loan applications in the names of Faith Walk Ministry parishioners. Each of those fraudulent PPP loan applications listed businesses that did not exist or included revenues that were never earned. The vast majority of the fraudulent PPP loans completed by Defendant McClain or Defendant Hardin—including the fraudulent PPP loans submitted in their names—were submitted via interstate wiring from Faith Walk Ministry, within the Eastern District of Missouri.

Based on the material misrepresentations included in the dozens of fraudulent PPP loan applications that were completed and submitted at the direction of Defendant Sparks and Defendant Oboite, participating PPP lenders paid out more than one million dollars in government-backed funds. Defendant Oboite—for his role in the conspiracy—expected to receive a percentage of the fraudulent PPP loan proceeds.

**B. Defendant J. Long's Fraudulent PPP Loan**

In furtherance of the scheme to defraud, Defendant J. Long—a parishioner at Faith Walk Ministry—caused the submission of a fraudulent sole proprietorship PPP loan in his own name on or about April 2, 2021. Like many of the fraudulent Faith Walk Ministry PPP loan applications, Defendant J. Long's application was for a "consultant" business that did not exist. Defendant J. Long personally participated in the application process by signing the promissory note from his personal residence, within the Eastern District of Missouri. In addition, Defendant J. Long pocketed at least $8,000 of the PPP loan proceeds for himself.

**C. Fraudulent PPP Loans for Businesses Purportedly Owned by Defendant H. Long**

In addition to taking out fraudulent sole proprietorship PPP loans in the names of Defendant Sparks' parishioners and associates, Defendant Sparks and Defendant Oboite also directed Defendant McClain and Defendant H. Long to submit fraudulent PPP loan applications for businesses purportedly owned by Defendant H. Long. Those businesses included Jabin II and Faith Walk Ministry Community Development Corporation.

On or about April 4, 2021, Defendant McClain—with the assistance of Defendant H. Long—submitted a fraudulent PPP loan application for Jabin II. Included in the fraudulent PPP loan application for Jabin II was the material misrepresentation that the company paid an average monthly payroll of $64,657.00. In truth and fact, as Defendant McClain and Defendant H. Long well knew, Jabin II did not have any payroll expenses. In support of the fraudulent PPP loan application that Defendant McClain submitted for Jabin II, Defendant McClain also submitted false and fraudulent tax forms, which were approved and signed by Defendant H. Long. Included

in Defendant H. Long's false and fraudulent tax documents for Jabin II was the misrepresentation that Jabin II earned $1,989,000.00 in gross receipts or sales during 2019. In truth and fact, as Defendant H. Long and Defendant McClain well knew, this figure was vastly inflated. Despite Defendant H. Long's knowledge that the Jabin II tax documents were false and fraudulent, he approved and signed those documents to ensure that the lender provided Jabin II with a substantial PPP loan. Based on the material misrepresentations made by Defendant H. Long and Defendant McClain as part of the Jabin II PPP loan application, the participating PPP lender (TAB Bank) wired a total of $161,642.00 into a bank account controlled by Defendant H. Long.

Defendant McClain—with the assistance of Defendant H. Long—submitted a similar fraudulent PPP loan application for Faith Walk Community Development Corporation on or about March 26, 2021. Included in the fraudulent PPP loan application for Faith Walk Community Development Corporation was the material misrepresentation that the company paid an average monthly payroll of $64,882.00. In truth and fact, as Defendant McClain and Defendant H. Long well knew, Faith Walk Community Development Corporation did not have any payroll expenses. Based on the material misrepresentations made by Defendant H. Long and Defendant McClain as part of the Faith Walk Community Development Corporation PPP loan application, the participating PPP lender (Customers Bank) wired a total of $162,204.00 into a bank account controlled by Defendant H. Long.

### D. Defendant Oboite and His Co-Conspirators' Efforts to Falsely Convince Navy Federal Credit Union that the Fraudulent PPP Loans Were Legitimate

After Faith Walk Ministry parishioners received the fraudulent PPP loan proceeds in the Navy Federal Credit Union bank accounts they had opened at Defendant Sparks' direction, Navy

Federal Credit Union froze several of the parishioners' bank accounts based on suspected fraud. In an effort to conceal the scheme to defraud and reopen the parishioners' bank accounts, Defendant Sparks and Defendant Oboite coached their co-conspirators on the lies that they should tell if Navy Federal Credit Union inquired into their PPP loans.

In furtherance of the conspiracy and scheme, Defendant Oboite sent Defendant Sparks false and fraudulent "scripts" for co-conspirators to read to Navy Federal Credit Union in an effort to retrieve the fraud proceeds. Those scripts were written and designed by Defendant Oboite to have his co-conspirators persuade Navy Federal Credit Union that the PPP loans in their names were validly "approved" by the lenders and that the loans were not fraudulently obtained.

For example, on or about June 14, 2021, Defendant Oboite emailed a specific "script" for Defendant Shefte (a parishioner who received a fraudulent PPP loan) to use when she spoke with a representative of Navy Federal Credit Union. In that fraudulent script, Defendant Oboite directed Defendant Shefte to tell the bank that she was the person who applied for the PPP loan for her business. Defendant Oboite also directed Defendant Shefte to tell the bank that she's had her business for "about 3 years." To further convince the bank to release the fraudulent PPP money, Defendant Oboite also directed Defendant Shefte to tell that bank that her PPP loan application was "approved" by the lender.

On or about June 16, 2021 (two days after Defendant Oboite sent the fraudulent script referenced immediately above), Defendant Shefte spoke with a representative of Navy Federal Credit Union. Following the script, Defendant Shefte told the bank's representative that she submitted her PPP loan application for her business. Despite the fact that Defendant Shefte's PPP loan application falsely and fraudulently stated that she ran an administrative consultant business

that earned $89,500 in 2019, Defendant Shefte attempted to convince the representative of Navy Federal Credit Union that her PPP loan was not fraudulently obtained.

On or about that same date—June 16, 2021—Defendant West also spoke with a representative of Navy Federal Credit Union. During that conversation, Defendant West told the bank's representative that she submitted her PPP loan application for her business. Despite the fact that Defendant West's PPP loan application falsely and fraudulently stated that she ran an administrative management business that earned $90,200 in 2019, Defendant West attempted to convince the representative of Navy Federal Credit Union that her PPP loan was not fraudulently obtained.

Defendant N. Long also spoke with a representative of Navy Federal Credit Union, specifically on or about June 9, 2021. During that conversation, Defendant N. Long told the bank's representative that her PPP loans were for her businesses. Defendant N. Long also told the bank's representative that she should not be required to provide the bank with the documentation supporting her PPP loans because her loans were "approved."

In addition to sending fraudulent scripts to co-conspirators, Defendant Oboite also provided false and fraudulent tax documents to co-conspirators for the purpose of convincing Navy Federal Credit Union to unfreeze the PPP fraud proceeds. For example, on June 11, 2021, Defendant Oboite emailed Defendant Sparks a fraudulent tax document in the name of Defendant N. Long. That fraudulent tax document falsely represented that Defendant N. Long ran a management consulting business that earned $66,550 in 2020. Three days later—on June 14, 2021—Defendant N. Long sent that fraudulent tax document to Navy Federal Credit Union in an attempt to convince the bank to grant her access to the proceeds of her fraudulent PPP loans.

After Faith Walk Ministry parishioners received the unfrozen fraudulent PPP loan proceeds in their bank accounts, Defendant Sparks and others directed them on where to send the proceeds. Unbeknownst to many Faith Walk Ministry parishioners, Defendant Sparks ultimately received hundreds of thousands of dollars from the fraudulent PPP loans that were submitted in their names. Instead of providing that money to Faith Walk Ministry or his parishioners, Defendant Sparks spent the fraudulently obtained loan proceeds on himself—paying for designer clothing, luxury merchandise, and expensive cars.

When many Faith Walk Ministry parishioners questioned Defendant H. Long about the loans proceeds in their bank accounts or where the money was going, Defendant H. Long assured those parishioners that they should trust Defendant Sparks. When those same questions were posed by parishioners to Defendant Sparks, he would threaten parishioners with "curses from God." Defendant Sparks also regularly scolded parishioners who inquired about his fraudulent scheme for questioning a "man of God."

**COUNT 3**

Beginning by at least on or about September 17, 2018, and continuing through at least on or about July 17, 2024, in the Eastern District of Missouri, Defendant Oboite, with the intent to defraud, devised and intended to devise a scheme and artifice to defraud lenders and to obtain money and property from lenders by means of material false and fraudulent pretenses, representations, and promises, as described further herein.

On April 2, 2021, in the Eastern District of Missouri, and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and obtain money and property by means of false and fraudulent pretenses, representations and promises and for the purpose of

executing the same, Defendant Oboite did knowingly cause to be transmitted by means of wire communication in and affecting interstate commerce, certain writings, signs, signals, pictures, or sounds, to wit:

| | | | |
|---|---|---|---|
| **3** | **Defendant Oboite** | 4/1/2021 | An electronic PPP loan application submitted for Defendant H. Long through an out-of-state server from the Eastern District of Missouri. |

**5. <u>STATUTORY PENALTIES</u>:**

The defendant fully understands that the maximum possible penalty provided by law for counts 1 and 3, to which the defendant is pleading guilty, is imprisonment of not more than 20 years, a fine of not more than $250,000, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than 3 years.

**6. <u>U.S. SENTENCING GUIDELINES: 2023 MANUAL</u>:**

The defendant understands that this offense is affected by the U.S. Sentencing Guidelines and the actual sentencing range is determined by both the Total Offense Level and the Criminal History Category. The parties agree that the following U.S. Sentencing Guidelines Total Offense Level provisions apply.

**a. <u>Chapter 2 Offense Conduct</u>:**

**(1) <u>Base Offense Level</u>:** The parties agree that the base offense level is **7**, as found in Section 2B1.1(a)(1).

**(2) <u>Specific Offense Characteristics</u>:** The parties agree that the following Specific Offense Characteristics apply:

The parties agree that **14 levels** should be added pursuant to Section 2B1.1(b)(1)(D) because the loss exceeds $550,000, but does not exceed $1,500,000.

The parties agree that **2 levels** should be added pursuant to Section 2B1.1(b)(2) because the offense involved 10 or more victims.

The parties agree that **2 levels** should be added pursuant to Section 2B1.1(b)(11)(C)(i) because the offense involved Defendant's unauthorized use of her purported means of identification on a fraudulent application for a PPP and EIDL loan to obtain any other means of identification (account number created in connection with application).

The parties agree that **2 levels** should be added pursuant to Section 2B1.1(b)(12) because the offense involved conduct described in 18 U.S.C. § 1040.

**Chapter 3 Adjustments:**

**(1) Acceptance of Responsibility:** The parties agree that **3 levels** should be deducted pursuant to Section 3E1.1(a) and (b), because the defendant has clearly demonstrated acceptance of responsibility. The parties agree that the defendant's eligibility for this deduction is based upon information presently known. If subsequent to the taking of the guilty plea the Government receives new evidence of statements or conduct by the defendant which it believes are inconsistent with defendant's eligibility for this deduction, the Government may present said evidence to the court, and argue that the defendant should not receive all or part of the deduction pursuant to Section 3E1.1, without violating the plea agreement.

**Other Adjustments:** The parties have no further agreement regarding any other adjustments.

**Estimated Total Offense Level:** The parties estimate that the total offense level is **24**. If the presentence investigation report determines a different total offense level, the parties are

permitted to object to or accept any enhancements or reductions in the presentence investigation report.

**Criminal History:** The determination of the defendant's Criminal History Category shall be left to the Court. Either party may challenge, before and at sentencing, the finding of the Presentence Report as to the defendant's criminal history and the applicable category. The defendant's criminal history is known to the defendant and is substantially available in the Pretrial Services Report.

**Effect of Parties' U.S. Sentencing Guidelines Analysis:** The parties agree that the Court is not bound by the Guidelines analysis agreed to herein. The parties may not have foreseen all applicable Guidelines. The Court may, in its discretion, apply or not apply any Guideline despite the agreement herein and the parties shall not be permitted to withdraw from the plea agreement. The Government recognizes it is bound by the specific agreements made above but reserves the right to answer any questions the U.S. Probation Office or the Court might have related to sentencing or present evidence at the Court's request.

7. **WAIVER OF APPEAL AND POST-CONVICTION RIGHTS:**

**a. Appeal:** The Defendant has been fully apprised by defense counsel of the Defendant's rights concerning appeal and fully understands the right to appeal the sentence under Title 18, United States Code, Section 3742.

**(1) Non-Sentencing Issues:** The parties waive all rights to appeal all non-jurisdictional, non-sentencing issues, including, but not limited to, any issues relating to pretrial motions, discovery, the guilty plea, the constitutionality of the statute(s) to which Defendant is pleading guilty and whether the Defendant's conduct falls within the scope of the statute(s).

**(2) Sentencing Issues:** The parties agree to waive the right to appeal all sentencing issues except those related to: (1) application of Sentencing Guideline offense-level adjustments (including those based on criminal history) not specifically set forth in the plea agreement or non-application of adjustments specifically set forth in the agreement; (2) calculation of the defendant's criminal history category; or (3) substantive reasonableness of the sentence—above the Guideline range ultimately determined by the Court for appeals taken by the defendant, or below that range for appeals taken by the Government.

**b. Habeas Corpus:** The Defendant agrees to waive all rights to contest the conviction or sentence in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255, except for claims of prosecutorial misconduct or ineffective assistance of counsel.

**c. Right to Records:** The Defendant waives all rights, whether asserted directly or by a representative, to request from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 522, or the Privacy Act, Title 5, United States Code, Section 552(a).

**8. OTHER:**

**a. Disclosures Required by the United States Probation Office:** The defendant agrees to truthfully complete and sign forms as required by the United States Probation Office prior to sentencing and consents to the release of these forms and any supporting documentation by the United States Probation Office to the Government.

b. **Supervised Release:** Pursuant to any supervised release term, the Court will impose standard conditions upon the defendant and may impose special conditions related to the crime defendant committed. These conditions will be restrictions on the defendant to which the defendant will be required to adhere. Violation of the conditions of supervised release resulting in revocation may require the defendant to serve a term of imprisonment equal to the length of the term of supervised release, but not greater than the term set forth in Title 18, United States Code, Section 3583(e)(3), without credit for the time served after release. The defendant understands that parole has been abolished.

c. **Mandatory Special Assessment:** Pursuant to Title 18, United States Code, Section 3013, the Court is required to impose a mandatory special assessment of $100 per count, which the defendant agrees to pay at the time of sentencing. Money paid by the defendant toward any restitution or fine imposed by the Court shall be first used to pay any unpaid mandatory special assessment.

d. **Possibility of Detention:** The defendant may be subject to immediate detention pursuant to the provisions of Title 18, United States Code, Section 3143.

e. **Fines, Restitution and Costs of Incarceration and Supervision:** The Court may impose a fine, restitution (in addition to any penalty authorized by law), costs of incarceration and costs of supervision. The defendant agrees that any fine or restitution imposed by the Court will be due and payable immediately. Pursuant to Title 18, United States Code, Section 3663A, an order of restitution is mandatory for all crimes listed in Section 3663A(c). Regardless of the Count of conviction, the amount of mandatory restitution imposed shall include all amounts allowed by

Section 3663A(b) and the amount of loss agreed to by the parties, including all relevant conduct loss. The defendant agrees to provide full restitution to all victims of all charges in the Indictment.

**f. <u>Forfeiture</u>:** The defendant agrees to the forfeiture set forth in the Forfeiture Allegation in the Indictment to which the Defendant is pleading guilty. This agreement includes any items that were seized by law enforcement officials during the course of this investigation. The Defendant also agrees to the entry of a forfeiture money judgment in the amount of restitution determined by the court at sentencing. The Defendant further agrees that the proffer of evidence supporting this guilty plea is sufficient evidence to support such forfeiture.

The Defendant agrees that the Court may enter a consent preliminary order of forfeiture at the time of his guilty plea or at any time before sentencing. The Defendant further agrees that this order will become final as to the Defendant when it is issued and will be part of his sentence pursuant to Fed. R. Crim. P. 32.2(b)(4)(A).

The Defendant agrees that the Government may choose in its sole discretion how it wishes to accomplish forfeiture, whether by criminal or civil forfeiture, using judicial or non-judicial forfeiture processes. The Defendant waives all rights to assert any interest in the forfeited property in the future, and will withdraw any prior claims made to forfeited property, whether they were made in a judicial or non-judicial forfeiture process.

The Defendant agrees (i) to assist the Government in identifying all property that is subject to forfeiture, (ii) to take any and all actions necessary to transfer title and ownership of said property to the Government, and (iii) to help the Government to rebut the claims of nominees and/or alleged third party owners, including by testifying truthfully in any judicial forfeiture proceeding.

The Defendant knowingly and intelligently waives all constitutional and statutory challenges in any manner to any forfeiture carried out in accordance with this plea agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The Defendant further knowingly and intelligently waives any rights the Defendant may have (i) for notice of the forfeiture to be given in the charging instrument, (ii) for a jury or the Court to determine what property is subject to forfeiture, (iii) for the Court to explain the forfeiture at the Defendant's change of plea hearing, and (iv) for the forfeiture to be made part of the oral pronouncement of sentence and included in the judgment.

**9. ACKNOWLEDGMENT AND WAIVER OF THE DEFENDANT'S RIGHTS:**

In pleading guilty, the defendant acknowledges, fully understands and hereby waives her rights, including but not limited to: the right to plead not guilty to the charges; the right to be tried by a jury in a public and speedy trial; the right to file pretrial motions, including motions to suppress or exclude evidence; the right at such trial to a presumption of innocence; the right to require the Government to prove the elements of the offenses against the defendant beyond a reasonable doubt; the right not to testify; the right not to present any evidence; the right to be protected from compelled self-incrimination; the right at trial to confront and cross-examine adverse witnesses; the right to testify and present evidence and the right to compel the attendance of witnesses. The defendant further understands that by this guilty plea, the defendant expressly waives all the rights set forth in this paragraph.

The defendant fully understands that the defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of the proceeding. The defendant's counsel has explained these rights and the consequences of the

waiver of these rights. The defendant fully understands that, as a result of the guilty plea, no trial will, in fact, occur and that the only action remaining to be taken in this case is the imposition of the sentence.

The defendant is fully satisfied with the representation received from defense counsel. The defendant has reviewed the Government's evidence and discussed the Government's case and all possible defenses and defense witnesses with defense counsel. Defense counsel has completely and satisfactorily explored all areas which the defendant has requested relative to the Government's case and any defenses.

The guilty plea could impact defendant's immigration status or result in deportation. In particular, if any crime to which defendant is pleading guilty is an "aggravated felony" as defined by Title 8, United States Code, Section 1101(a)(43), removal or deportation is presumed mandatory. Defense counsel has advised the defendant of the possible immigration consequences, including deportation, resulting from the plea.

**10. VOLUNTARY NATURE OF THE GUILTY PLEA AND PLEA AGREEMENT:**

This document constitutes the entire agreement between the defendant and the Government, and no other promises or inducements have been made, directly or indirectly, by any agent of the Government, including any Department of Justice attorney, concerning any plea to be entered in this case. In addition, the defendant states that no person has, directly or indirectly, threatened or coerced the defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

The defendant acknowledges having voluntarily entered into both the plea agreement and the guilty plea. The defendant further acknowledges that this guilty plea is made of the defendant's own free will and that the defendant is, in fact, guilty.

**11. <u>CONSEQUENCES OF POST-PLEA MISCONDUCT</u>:**

After pleading guilty and before sentencing, if defendant commits any crime, other than minor traffic offenses, violates any condition of release that results in revocation, violates any term of this guilty plea agreement, intentionally provides misleading, incomplete or untruthful information to the U.S. Probation Office or fails to appear for sentencing, the United States, at its option, may be released from its obligations under this agreement. The Government may also, in its discretion, proceed with this agreement and may advocate for any sentencing position supported by the facts, including but not limited to obstruction of justice and denial of acceptance of responsibility.

**12. <u>NO RIGHT TO WITHDRAW GUILTY PLEA</u>:**

Pursuant to Rule 11(c) and (d), Federal Rules of Criminal Procedure, the defendant understands that there will be no right to withdraw the plea entered under this agreement, except where the Court rejects those portions of the plea agreement which deal with charges the Government agrees to dismiss or not to bring.

| | |
|---|---|
| 6/13/25<br>Date | Derek J. Wiseman<br>Assistant United States Attorney |
| 5/9/2025<br>Date | Jeffrey Oboite<br>ID DPg1nkGZStsHUwwCDQXs2UBb<br>Jeffrey Oboite<br>Defendant |
| 5/9/2025<br>Date | ID kTrk6RBXY24nQAkyFyNPdd5<br>Todd A. Spodek<br>Attorney for Defendant |

# eSignature Details

| | |
|---|---|
| **Signer ID:** | **DPg1nkGZStsHUwwCDQXs2UBb** |
| Signed by: | Jeffrey Oboite |
| Sent to email: | jeff@emeraldscore.com |
| IP Address: | 96.255.16.252 |
| Signed at: | May 9 2025, 4:16 pm EDT |

| | |
|---|---|
| **Signer ID:** | **itTrk6RBXY24nQAkyFyNPdd5** |
| Signed by: | Todd Spodek |
| Sent to email: | ts@spodeklawgroup.com |
| IP Address: | 24.168.28.246 |
| Signed at: | May 9 2025, 4:19 pm EDT |